Gregory **CAMPBELL** and Katherine Campbell, as next friends of Douglas Campbell, Plaintiffs–Appellants,

v.

**BOARD OF EDUCATION OF THE CENTERLINE SCHOOL DISTRICT, Defendant–Appellee.**

No. 01–1186.

United States Court of Appeals, Sixth Circuit.

Feb. 13, 2003.

Before KEITH, KRUPANSKY, and CLAY, Circuit Judges.

KRUPANSKY, Circuit Judge.

The Plaintiffs–Appellants, Gregory and Katherine Campbell, a married couple ("the Campbells"), as the parents of Douglas Campbell ("Douglas"), have assailed the district court's summary judgment favoring the Defendant–Appellee Centerline Public School District Board of Education ("Centerline," "the school district," or "the school board"), by which it dismissed their complaint anchored in, *inter alia*, section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794.[1] The Campbells had asserted that the school district had educationally discriminated against their allegedly dyslexic son by assigning him to its standard remedial reading program ("Project Read") rather than enrolling him in a private tutorial course (the "Orton–Gillingham Program") at public expense. The trial court resolved that the plaintiffs failed to produce sufficient evidence to support their claim that the school board had not reasonably accommodated Douglas' individual educational needs, as required by federal law.

Douglas, born August 14, 1982, was a student in the Centerline Public School System from grades kindergarten through twelve. He displayed below average reading and writing skills since at least the eighth grade. At that time, Centerline began furnishing supplemental literacy instruction to him. Standardized examinations administered during Douglas' eighth and ninth grade years confirmed that his literacy aptitude lagged behind the norm. The school district's psychologist, Dr. Mary Nugent ("Dr.Nugent"), interpreted Douglas' examination results to reflect achievement deficits caused by behavioral problems including juvenile impulsiveness, inattentiveness, and failure to concentrate on schoolwork; however, she concluded that "developmental dyslexia" was *not* indicated. Subsequently, the plaintiffs, evidently dissatisfied with Dr. Nugent's diagnosis, disallowed further assessment of Douglas' educational underachievement by the school district's professionals.

Instead, the Campbells secured an independent evaluation of their son's substandard literacy skills at the Michigan Dyslexic Institute ("MDI"), a private foundation. An MDI psychologist, Dr. Robert D. Smith ("Dr.Smith"), opined that Douglas suffered from developmental dyslexia. Accordingly, Dr. Smith concluded that Douglas should be eligible for special remedial educational benefits financed by his public school system as mandated by section 504 of the Rehabilitation Act. Centerline's psychologists initially rejected Dr. Smith's diagnosis and recommendation, but ultimately assented to bestow "section 504 eligibility" upon Douglas. That legal status entitled the boy to a diverse array of pedagogical advantages, including the privileges of oral testing, the tape-record-

---

1. Section 504 of the Rehabilitation Act provides, in material part:

    No otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

    29 U.S.C. § 794(a). Centerline schools receive federal funding.

ing of in-class proceedings, and access to a classmate's course notes. Most importantly, the school district offered to assign the pupil in its standard remedial program for literacy-impaired youngsters, denominated "Project Read." That regime of corrective instruction, developed by experienced and respected educators and psychologists, has been successfully implemented in countless school districts across America.

Nevertheless, the Campbells forbade Douglas' participation in Centerline's Project Read. Instead, the plaintiffs insisted that the school board finance his enrollment in an alternative remedial reading course offered by MDI, namely the Orton–Gillingham Program ("the OG Program"). The plaintiffs supplied a letter written by Dr. Smith in support of their demand. However, Dr. Smith's letter categorized Project Read, the OG Program, and six additional identified instructional systems, as equally effective pedagogical processes for dyslexic pupils:

> The teaching essentials noted above are associated with the better known approaches that have been expressly developed for use with persons with specific language disability or dyslexia.

> The oldest, best known, and most influential of these approaches is Orton–Gillingham, an adaptation of what is the instructional approach used by the Michigan Dyslexia Institute instructors. *Other similar approaches* include Alphabetic phonics, the Slingerand program, Receipt for Reading, *Project Read*, Auditory Discrimination in Depth, DISTAR, and Project Language Arts (PLA) (Okemis, MI schools).

> While the above programs are judged to have merit, a caveat is in order. The success of any one of these programs is dependent upon instructors who have been well-trained and experienced in its use. With such instructors, there is no reason why Douglas should not become a competent reader and achieve related language skills reflective of his general ability.

(Emphases added).

However, irrespective of Dr. Smith's expert opinion that the Project Read methodology is similar in approach and effectiveness to the OG Program, and therefore is an equally suitable accommodation of Douglas' atypical instructional requirements, the Campbells nonetheless elected to place their son in MDI's private OG Program instead of the community-furnished Project Read. Subsequently, the Campbells and the school board agreed to submit the Campbells' continuing demands for reimbursement of tuition and expenses to a "due process" arbitration hearing before a retired professor of special education and former Eastern Michigan University department head. *See* 20 U.S.C. § 1415(f). The adversaries stipulated that the sole issue in controversy was whether the Project Read methodology would constitute an appropriate accommodation of Douglas' special educational needs. After hearing testimony from Dr. Smith, Dr. Nugent, and Dr. Terry Follbaum (the district's superintendent of schools), the due process hearing officer resolved

> that the remedial reading program offered to Douglas by The CLPS (Project Read) is equivalent, or superior to, the Orton–Gillingham program recommended by, and provided by, the Michigan Dyslexia Institute. Further, the Hearing officer believes that the selection of teaching methods is the responsibility of professional and appropriately trained and certified staff and is not the prerogative of parents and advocates. He further rules that the district did not discriminate against Douglas Campbell by offering a program other than the one selected by his parents.

On February 28, 2000, the plaintiffs challenged the administrative arbitrator's adverse ruling via a federal lawsuit against Centerline, which included federal and pendent state law causes of action. Following discovery, the defendant moved for summary judgment. On November 29, 2000, at the close of oral argument on that motion, the district judge granted summary judgment to the defendant from the bench.[2] The trial jurist directed, *inter alia*, that "[t]he plaintiffs have presented no evidence whatsoever that the Project Read Program would not have reasonably accommodated Doug's needs." The court further remarked that the plaintiffs' expert witness, Dr. Smith, had attested that the OG Program was not a comparatively superior instructional method versus Project Read.

The appellate court examines *de novo* a lower court's grant of summary judgment.[3] *Hansard v. Barrett,* 980 F.2d 1059, 1061 (6th Cir.1992). On review, the plaintiffs have argued that the trial court failed to construe the record evidence, and the reasonable inferences derivable from that evidence, in the light most favorable to them as the parties opposing summary judgment. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Campbells have contended that, when the record evidence is construed in the light most favorable to their case, they have produced sufficient evidence to support a triable "educational discrimination" claim under § 504 of the Rehabilitation Act. Regarding section 504 claims in general, the Sixth Circuit has propounded:

> The elements of a cause of action under section 504 are as follows: (1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*Doherty v. Southern College of Optometry,* 862 F.2d 570, 573 (6th Cir.1988). In the case *instanter,* the school district has not disputed the existence of elements one and four.

A plaintiff can satisfy element two of a Rehabilitation Act claim if he or she can "simply show that he or she is qualified to perform the function with or without reasonable accommodation by the defendant." *Doe v. Woodford County Bd. of Educ.,* 213 F.3d 921, 925 (6th Cir.2000). Stated differently, "[a] handicapped or disabled

---

**2.** On review, the plaintiffs have contested only the trial court's disposition of their Rehabilitation Act claim. Because they have not assailed its dismissal of the other claims which they had stated in their judicial complaint, they have abandoned those causes of action. *See, e.g., Grider v. Abramson,* 180 F.3d 739, 750 n. 14 (6th Cir.1999) (instructing that issues not adequately framed by the appellants in their opening brief "are not properly before this court.") (*quoting United States v. Perkins,* 994 F.2d 1184, 1191 (6th Cir.1993)).

**3.** In an "educational discrimination" case arising under the Rehabilitation Act, such as the one *sub judice,* the decisions of the due process hearing officer and the district court are reviewed by the appellate court under a "modified *de novo*" standard (which is the identical standard by which the district court initially scrutinizes the hearing officer's ruling), whereby a plenary independent judicial re-examination of the evidence is tempered by an accord of "due weight" to the administrative findings. *See* 20 U.S.C. § 1415(i)(2)(B)(iii); *Board of Educ. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Burilovich v. Bd. of Educ.,* 208 F.3d 560, 565–67 (6th Cir.2000); *Dong v. Bd. of Educ.,* 197 F.3d 793, 800 (6th Cir.1999).

person is 'otherwise qualified' to participate in a program if she can meet its necessary requirements with reasonable accommodation." *Kaltenberger v. Ohio College of Podiatric Medicine,* 162 F.3d 432, 435 (6th Cir.1998). However, the "accommodation" designed by the defendant to enable participation by a disadvantaged individual need not be "fundamental" or "substantial;" rather, it need only be "reasonable." *Id.* at 436 (*citing Alexander v. Choate,* 469 U.S. 287, 300, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)). By contrast, if a "reasonable accommodation" is feasible, but deliberately has not been furnished by the defendant, thereby impeding the plaintiff's ability participate in, or benefit from, the subject program, the defendant has discriminated against the plaintiff by reason of his or her handicap. thus satisfying element three of the prima facie case.

Generally, the Individuals with Disabilities Education Act ("IDEA"), as amended, 20 U.S.C. §§ 1400–20, informs a Rehabilitation Act discrimination claim which is buttressed by allegations that a public school district failed to appropriately accommodate a handicapped student's extraordinary educational needs. *See, e.g., Kaelin v. Grubbs,* 682 F.2d 595, 597 (6th Cir.1982); *Morgan v. Chris L.,* 106 F.3d 401 (Table), 1997 WL 22714 (6th Cir.1997) (unpub'd *per curiam*). Among other things, IDEA compels every public school system to furnish a "free appropriate public education" to each of its special needs students. *See* 20 U.S.C. §§ 1401(8). 1412(a)(1). However, "when reviewing the substance of academic decisions, courts 'should show great respect for the faculty's professional judgment.'" *Kaltenberger,* 162 F.3d at 436 (*quoting Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)). "Courts must also give deference to professional academic judgments when evaluating the

reasonable accommodation requirement." *Kaltenberger,* 162 F.3d at 436.

Accordingly, the "reasonable accommodation" requirement (derived from elements two and three of a Rehabilitation Act cause of action, evolved above), as informed by IDEA, demands that a learning-impaired Rehabilitation Act claimant who has alleged discrimination in public instruction must prove that the defendant school system failed to supply him or her with a community-financed education which was sufficiently "appropriate" to his or her personal learning requisites to enable his or her reasonable access to an education similar, relative to his or her individual academic potential and cognitive abilities, to that available to the average fellow student. Therefore, in the case *sub judice,* to survive summary judgment, the plaintiffs needed to proffer evidence, which, if credited by the fact-finder and construed most favorably for the plaintiffs. would be sufficient to prove that Douglas could have attained a "free appropriate public education"—that is, a publicly-sponsored education functionally equal to that offered by the defendant to its mainstream pupils—*if,* and *only if,* the defendant had furnished him with the OG Program, *irrespective* of the defendant's proffer of Project Read.

Consequently, to prove that the district had not supplied Douglas with an "appropriate public education," the plaintiffs would be required to prove at trial *not only* that the OG Program would have constituted a "reasonable accommodation" of the youth's supplemental scholastic needs, but *also* must prove that the Project Read course actually offered by the school system to Douglas would *not* have been a "reasonable accommodation" of his learning deficiencies. It bears emphasis that hypothetical proof that the OG Program would have been a *superior* accom-

modation of the student's special schooling needs would *not* comprise proof that Project Read was *not* a *reasonable* accommodation of those special needs. *See Dong v. Bd. of Educ.,* 197 F.3d 793, 800 (6th Cir. 1999). Stated differently, Douglas was entitled *only* to a "reasonable" public accommodation of his disability, *not* to the "best possible" accommodation. *Id.*

Moreover, *even if* the plaintiffs had proffered sufficient evidence to satisfy a rational jury that Project Read was *not* a "reasonable accommodation" of Douglas' scholarly impediments, the Rehabilitation Act *further requires* that the Campbells must ultimately prove that the defendant's failure to provide Douglas with a "free appropriate public education" was *discriminatory*. Surmounting that evidentiary hurdle requires that "either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of education of handicapped children." *Monahan v. State of Nebraska,* 687 F.2d 1164, 1171 (8th Cir.1982). *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1252, 75 L.Ed.2d 481 (1983); *see N.L. ex rel. Mrs. C. v. Knox County Schools,* 315 F.3d 688, 695 (6th Cir.2003) (*citing Monahan* with approval).

The Eighth Circuit has persuasively explained:

> The reference in the Rehabilitation Act to "discrimination" must require. we think, something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist. Experts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter. That a court may, after hearing evidence and argument, come to the conclusion that an incorrect evaluation has been made, and that a different placement must be required under [IDEA], is not necessarily the same thing as holding that a handicapped child has been discriminated against solely by reason of his or her handicap. An evaluation, in other words, is not discriminatory merely because a court would have evaluated the child differently.

*Id.* at 1170.

The *Monahan* court concluded:

> So long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under Section 504.

*Id.* at 1171.

■ In the case *instanter,* the plaintiffs evidenced that the OG Program was a "reasonable accommodation" of Douglas' special academic needs, and therefore its provision by the school district would have afforded him a "free appropriate public education." However, the plaintiffs *failed to evince* that the Project Read system instead offered by the school district was *not* a "reasonable accommodation" of their son's personal instructional requirements. Therefore, they could not prove at trial that the defendant had failed to provide Douglas with a "free appropriate public education." Indeed, the diagnostic letter and deposition testimony of the plaintiffs' expert witness, Dr. Smith, contained dispositive admissions that Project Read comprised a "reasonable accommodation" of Douglas' reading disorder.

Furthermore, even assuming *arguendo* that evidence existed upon which a rational jury could find that *only* the OG Program could have reasonably accommodated Douglas' special needs (which evidence was not present in the instant record), the plaintiffs neglected to offer any evidence

which could support a jury finding that the defendant's pertinent decision-makers had failed to exercise a reasonable degree of professional judgment in the course of determining that Project Read would adequately accommodate Douglas' learning disadvantages. Accordingly, because, on the subject record, the plaintiffs could not convince any rational fact-finder that the defendant had "discriminated" against Douglas in its provision of educational benefits, because they have not evidenced that the defendant had recklessly selected an inappropriate accommodation for Douglas, they could not prove at trial the third essential element of their Rehabilitation Act case. Thus, summary judgment for the defendant was mandatory.

■ However, the plaintiffs, citing the third paragraph of the excerpt from Dr. Smith's letter quoted above, have mounted an alternative attack against the adequacy of Centerline's Project Read regiment, *videlicet* that, *even if* the instructional methods encompassed by the Project Read approach, in the abstract, would have objectively accommodated Douglas' literacy disabilities, *the defendant has failed to prove* that its *specific instructors* assigned to its Project Read course were *qualified,* by training and experience, to execute that methodology with positive results. In the first instance, the plaintiffs have *expressly waived* that contention by stipulating, during the administrative hearing, that the *sole issue in contention* was whether the Project Read *methodology* offered a reasonable accommodation of Douglas' unique educational requirements.[4]

■ Moreover, even assuming *arguendo* that the Campbells had *not* waived the "teacher qualifications" issue, *it was they, not the defendant, who must carry the burden of proof* on that matter at trial. *See Dong,* 197 F.3d at 799. Nonetheless, the plaintiffs failed, during both the due process arbitration hearing and the district court proceeding, to submit any material evidence probative of the alleged absence of sufficient appropriate training and experience on the part of Centerline's Project Read educators. Indeed, the Campbells have offered no proof whatsoever regarding the credentials, or lack thereof, of any instructor teaching in the school district's Project Read program. The plaintiffs cannot carry their burden of proffering sufficiently probative evidence to create a triable fact issue merely by pointing to the failure of the defendant to offer the testimony of its Project Read teachers, or by referencing testimony by the defendant's superintendent of schools and school psychologist which reflected that those wit-

4. Accordingly, the plaintiffs did *not* merely *neglect to exhaust available administrative remedies* regarding their 29 U.S.C. § 794(a) educational discrimination claim as supported by the allegation that the school board's Project Read teachers were unqualified for that role; therefore, the instant court need not resolve the effect of the plaintiffs' evident failure to exhaust available administrative remedies. *Compare Crocker v. Tennessee Secondary School Athletic Ass'n,* 873 F.2d 933 (6th Cir.1989) *with Pendleton v. Jefferson Local School Dist. Bd. of Educ.,* 958 F.2d 372 (Table), 1992 WL 57421, at *6 (6th Cir.1992) (unpub'd *per curiam* ). Nor did the plaintiffs merely *forfeit* that argument *by silence* before the administrative hearing officer and/or the district court; if they had done so, that forfeiture could be judicially excused under certain circumstances. *See United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Koeberlein,* 161 F.3d 946, 949 & n. 2 (6th Cir.1998). Rather, they knowingly *waived* that theory by *agreeing,* during the due process hearing, to restrict their claim solely to the alleged systemic demerits of the Project Read method; once made, the resulting waiver of all other arguments or claims in support of the Campbells' discrimination cause under the Rehabilitation Act was *final and irrevocable. See id.*

nesses lacked precise personal knowledge of the relevant credentials of the school district's Project Read instructors. Rather, as the litigants which must carry the burden of proof at trial, the plaintiffs needed to produce *actual evidence* sufficient to create a triable issue as to the unsuitability of the defendant's Project Read educators for their assigned task, and further that the defendant had carelessly exercised deficient professional judgment by retaining those instructors for that duty. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The plaintiffs failed to do so.

This reviewing court has carefully considered the additional assignments of error proffered by the plaintiffs, and has concluded that they were inadequately framed or otherwise misconceived. *See United States v. Layne,* 192 F.3d 556, 566–67 (6th Cir.1999); *United States v. Elder,* 90 F.3d 1110, 1118 (6th Cir.1996). Following careful study and consideration of the district court's well-reasoned November 29, 2000 bench ruling by which it granted summary judgment to the defendant, the briefs and arguments of counsel, the materials contained in the litigants' joint appendix, and the controlling legal authorities, this appellate bench, upon *de novo* examination, has identified no material reversible error of fact or law in the district judge's ultimate adverse resolution of the plaintiffs' claims. Accordingly, the district court's summary judgment in favor of the defendant is AFFIRMED.