RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0078p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

G.C.,

          *Plaintiff-Appellant*,

     v.

No. 11-6476

OWENSBORO PUBLIC SCHOOLS; LARRY VICK, in his individual capacity as Superintendent of Owensboro High School; ANITA BURNETTE, in her individual capacity as Principal of Owensboro High School; MELISSA BROWN and CHRISTINA SMITH, in their individual capacities as Assistant Principals of Owensboro High School,

          *Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 4:09-cv-102—Joseph H. McKinley, Jr., Chief District Judge.

Argued: January 24, 2013

Decided and Filed: March 28, 2013

Before: NORRIS, MOORE, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Edward E. Dove, DOVE LAW OFFICE, Lexington, Kentucky, for Appellant. Michael A. Owsley, ENGLISH, LUCAS, PRIEST & OWSLEY, LLP, Bowling Green, Kentucky, for Appellees. **ON BRIEF:** Edward E. Dove, DOVE LAW OFFICE, Lexington, Kentucky, for Appellant. Michael A. Owsley, ENGLISH, LUCAS, PRIEST & OWSLEY, LLP, Bowling Green, Kentucky, for Appellees.

     MOORE, J., delivered the opinion of the court, in which DONALD, J., joined, and NORRIS, J., joined in part. NORRIS, J. (pp. 18–19), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   Plaintiff-Appellant G.C. began attending school in the Owensboro Public School District as an out-of-district student in 2005.  In September 2009, G.C. was caught sending text messages in class.  School officials confiscated his cell phone and read the text messages.  Because this was the last in a series of disciplinary infractions, Superintendent Dr. Larry Vick ("Vick") revoked G.C.'s out-of-district status, barring him from attending Owensboro High School.  G.C. filed suit, raising both federal and state-law claims against Defendants-Appellees Owensboro Public Schools, Vick, Principal Anita Burnette ("Burnette"), Assistant Principal Melissa Brown ("Brown"), and Assistant Principal Christina Smith ("Smith"), (collectively, "defendants").  The defendants moved for summary judgment, which the district court granted.

G.C. appeals the district court's resolution of three of his claims:  (1) his due-process claim, in which he argues that he was denied a hearing prior to expulsion as required by Kentucky statute; (2) his Fourth Amendment claim based on the September 2009 search, in which he contends that school officials violated his constitutional rights when they read text messages on his phone without the requisite reasonable suspicion; and (3) his Rehabilitation Act claim, in which he argues that the defendants failed to identify him as disabled under § 504.

For the reasons stated below, we **REVERSE** the district court's grant of summary judgment on G.C.'s due-process claim and on G.C.'s Fourth Amendment claim based on the September 2009 search.  We **AFFIRM** the district court's grant of summary judgment on G.C.'s Rehabilitation Act claim.  We **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

From 2005 to 2008, G.C. enrolled as an out-of-district student in the Owensboro Public School District. R. 69-17 (Vick Aff. at ¶ 5) (Page ID #499); R.69-3 (G.C. Tr. at 10:4–21) (Page ID #359). Owensboro Public School District has a reciprocal agreement with Daviess County Public School District, the district where G.C.'s parents reside, that allows a limited number of students to enroll in the district where they do not reside. R. 69-17 (Vick Aff. at ¶ 3) (Page ID #499). As explained by Vick, "[o]ut-of-district students who attend the [Owensboro Public School District] do so pursuant to Board [P]olicy 09.125 . . . . This policy provides in pertinent part, 'The continued enrollment of non-resident students in the District's schools is subject to the recommendation of the school Principal and the approval of the Superintendent.'" *Id.* ¶ 4 (quoting R. 19, Ex. A (Board Policy 09.125 at 1) (Page ID #117)). Under this policy, "[n]onresident students are defined as those whose parent or guardian resides outside the District." R. 19, Ex. A (Board Policy 09.125 at 1) (Page ID #117).

During his freshman year at Owensboro High School, G.C. began to have disciplinary problems. Shortly thereafter, he communicated with school officials that he used drugs and was disposed to anger and depression. The relevant incidents and discussions are as follows. On September 12, 2007, the first incident in the record, G.C. was given a warning for using profanity in class. R. 69-7 (Referral at 1) (Page ID #466). In February 2008, G.C. visited Smith's office and expressed to Smith "that he was very upset about an argument he had with his girlfriend, that he didn't want to live anymore, and that he had a plan to take his life." R. 69-8 (Smith Aff. at ¶ 4) (Page ID #467). In this same meeting, G.C. told Smith "that he felt a lot of pressure because of football and school and that he smoked marijuana to ease the pressure." *Id.* ¶ 5. As a result of this interaction, Smith met with G.C.'s parents and suggested that he be evaluated for mental health issues. *Id.* ¶ 6. G.C.'s parents took him to a treatment facility that day. *Id.*; R. 69-28 (Bio-Psycho Social Assessment) (Page ID #536–48).

On November 12, 2008, G.C. was given a warning for excessive tardies, and on November 17, 2008, G.C. was disciplined for fighting and arguing in the boys locker

room.  R. 69-12 (Referrals at 1) (Page ID #490).  On March 5, 2009, G.C. walked out of a meeting with Summer Bell, the prevention coordinator at the high school, and left the building without permission.  R. 69-8 (Smith Aff. at ¶ 7) (Page ID #468); R. 69-10 (Bell Tr. at 40:19–21) (Page ID #484).  G.C. made a phone call to his father and was located in the parking lot at his car, where there were tobacco products in plain view.  R. 69-8 (Smith Aff. at ¶ 8) (Page ID #468).  G.C. then went to Smith's office, and Smith avers that G.C. "indicated he was worried about the same things we had discussed before when he had told me he was suicidal."  *Id.*  She states that she "was very concerned about [G.C.'s] well-being because he had indicated he was thinking about suicide again.  I, therefore, checked [G.C.'s] cell phone to see if there was any indication he was thinking about suicide."  *Id.* ¶ 9.  The record also indicates that G.C. visited a treatment center that day, and the counselor recommended that he be admitted for one to two weeks.  R. 69-28 (Bio-Psycho Social Assessment) (Page ID #560–61).

On March 9, 2009, school officials convened a hearing with G.C. and his parents regarding the March 5 incident, at which both G.C. and school officials gave testimony.  R. 69-13 (Hearing Minutes at 1–2) (Page ID #491–92 ).  G.C. was placed on probation and assigned four days of in-school suspension.  *Id.* at 3 (Page ID #493).  On April 8, 2009, G.C. was suspended after yelling and hitting a locker.  R. 69-15 (Referral at 1) (Page ID #497).  At the end of the 2008–09 academic year, Burnette recommended that Vick revoke G.C.'s authorization to attend Owensboro High School.  R. 69-17 (Vick Aff. at ¶ 10) (Page ID #500).  Vick did not follow this recommendation, and on June 15, 2009, he met with G.C.'s parents to discuss "what was expected of [G.C.] to be permitted to continue attending the [Owensboro Public School District] as an out-of-district student."  *Id.*  According to Vick, he described the expectations as follows:

> At this meeting, I explained to [G.C.'s] parents that they had three options regarding their son's education.  First, I told them they could send [G.C.] to the [Daviess County Public School District] since they resided in that school district with their son.  I told them their second option was to actually move into the [Owensboro Public School District] and that, upon so doing, [G.C.] would be entitled to all the rights of a resident student.  Finally, I told them that despite . . . Burnette's recommendation, I would allow [G.C.] to continue to attend school in the

[Owensboro Public School District] as a non-resident student for the 2009–10 school year on the condition and understanding that, if he had any further disciplinary infraction, this privilege would be immediately revoked and he would be required to return to his home school district.

*Id.* ¶ 11.

On August 6, 2009, G.C.'s parents registered G.C. to attend Owensboro High School for the 2009–10 academic year. R. 69-16 (Registration Form at 1) (Page ID #498). Unlike in years past, however, they filled out an in-district registration form and listed G.C.'s physical address as that of his grandparents, who lived in the Owensboro Public School District. *Id.* On the same form, they stated that G.C. lived with his parents, who maintained their residence in the Daviess County School District. *Id.*

On September 2, 2009, G.C. violated the school cell-phone policy when he was seen texting in class. R. 69-4 (Brown Aff. at ¶ 4) (Page ID #384). G.C.'s teacher confiscated the phone, which was brought to Brown, who then read four text messages on the phone. *Id.* ¶¶ 4–6 (Page ID #384–85). Brown stated that she looked at the messages "to see if there was an issue with which I could help him so that he would not do something harmful to himself or someone else." *Id.* ¶ 6 (Page ID #385). Brown explained that she had these worries because she "was aware of previous angry outbursts from [G.C.] and that [he] had admitted to drug use in the past. I also knew [he] drove a fast car and had once talked about suicide to [Smith]. . . . I was concerned how [he] would further react to his phone being taken away and that he might hurt himself or someone else." *Id.* ¶ 5 (Page ID #384–85).

After this incident, Burnette recommended to Vick that G.C.'s out-of-district privilege be revoked, and this time Vick agreed. R. 69-17 (Vick Aff. at ¶ 16) (Page ID #501). G.C.'s parents were contacted and told that they could appeal the decision if desired. *Id.* ¶¶ 17–19. (Page ID #501–02). On October 15, 2009, Vick, Burnette, and other school officials met with G.C.'s parents and their attorney. *Id.* ¶ 21 (Page ID #502). Vick explained that G.C. "had violated the condition of his out-of-district privilege to attend Owensboro High School by texting in class." *Id.* Despite the

revocation, Vick avers that G.C. continued to have the right to attend high school in Daviess County.  *Id.* ¶ 22 (Page ID #503).

On October 21, 2009, G.C. filed an action for declaratory and injunctive relief, as well as compensatory and punitive damages, in the U.S. District Court for the Western District of Kentucky.  R. 1 (Compl.) (Page ID #1).  G.C. alleged violations of his First, Fourth, and Fifth Amendment rights as well as violations of the Kentucky Constitution. *Id.* at ¶¶ 18–37 (Page ID #1–5).  G.C. moved for a temporary restraining order and preliminary injunction, seeking to enjoin the defendants from denying G.C. his right to an education, which the district court denied on November 16, 2009.  R. 6 (Pl.'s Mot. at 1) (Page ID #36); R. 20 (Order Denying Preliminary Injunctive Relief at 1) (Page ID #123).  G.C. then amended his complaint to include a Rehabilitation Act claim.  R. 36 (First Am. Compl. at ¶¶ 39–48) (Page ID #195–96).  On June 2, 2011, the defendants filed a motion for summary judgment on all of G.C.'s claims, which the court granted as to G.C.'s federal claims.  R. 69-1 (Defs.' Mot. for Summ. J. at 1) (Page ID #315); R. 85 (Order at 25) (Page ID #767).  The court declined to exercise supplemental jurisdiction over G.C.'s state-law claims.  R. 85 (Order at 25) (Page ID #767).  In the same order, the district court denied G.C.'s motion requesting a *Daubert* hearing on the qualifications of the defendants' Rehabilitation Act expert witness.  *Id.* at 19–21. (Page ID #761–63).

## II.  STANDARD OF REVIEW

"We review de novo a district court's grant of summary judgment."  *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012).  "We review the evidence and draw all inferences in the light most favorable to . . . the nonmoving part[y]."  *Id.*  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.  DUE-PROCESS CLAIM

In *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court held that the Due Process Clause applies to suspension or expulsion from school where a state has conferred a property interest in a public education.  *Id.* at 572–74.  For suspensions of no more than ten days, the Court in *Goss* explained that the Fourteenth Amendment requires "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  *Id.* at 581.  The Supreme Court did not enumerate the process required for other disciplinary actions, but indicated that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."  *Id.* at 584.  After *Goss*, this court determined that "[a] student faced with expulsion has the right to a pre-expulsion hearing before an impartial trier-of-fact." *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 927 (6th Cir. 1988).  "As a general rule the hearing should be given before removal from the school unless the student's presence is dangerous or disruptive."  *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996).

Kentucky has codified these principles in §158.150 of the Kentucky Revised Statutes, which governs suspension and expulsion of a student from school.  KY. REV. STAT. ANN. § 158.150 (West 2006).  This provision describes, among other things, the procedures that a school district is required to provide prior to imposing an expulsion: "The board of education of any school district may expel any pupil for misconduct as defined in subsection (1) of this section, but the action shall not be taken until the parent, guardian, or other person having legal custody or control of the pupil has had an opportunity to have a hearing before the board."  *Id.* § 158.150(6).  The Owensboro Public School District has expressly incorporated this provision into its Code of Conduct:  "Expulsion—Upon the recommendation of the Superintendent the Board of Education may expel a student.  Expulsion actions shall be conducted in accordance with the provisions of KRS 158.150."  R. 69-5 (Code of Conduct at 12) (Page ID #399).

As it is not disputed for the purposes of this appeal that G.C. did not receive a pre-expulsion hearing, G.C.'s due-process claim turns on whether G.C. was actually expelled from Owensboro High School. Although the parties and the district court addressed at some length whether G.C. was an in-district student for the 2009–10 academic year, we need not consider this issue because even assuming he was an out-of-district student, we conclude that he would still be entitled to due process. *See* KY. REV. STAT. ANN. § 158.150(6) (requiring a hearing before the expulsion of "any pupil" from "any school district"). Concerning the expulsion, G.C. argues that revocation of the privilege to attend an out-of-district school is the functional equivalent of an expulsion, contending that an Opinion of the Kentucky Attorney General endorses this position. Appellant Br. at 27. The defendants reject this construction of an expulsion, arguing instead that Vick merely revoked G.C.'s privilege to attend Owensboro High School as an out-of-district student. Appellees Br. at 29–31. The defendants rely on Board Policy 09.125, entitled "Reciprocal Agreements with Other School Districts for Nonresident Students," which they argue gave Vick the discretion to remove an out-of-district student for any reason and at any time. *Id.* at 30. The district court agreed with the defendants, concluding that "[b]ecause G.C. attended Owensboro High School at the unfettered discretion of the Superintendent and because he did not reside in that School District, G.C. did not have a property interest in an education within the Owensboro Public School District." R. 85 (Order at 13) (Page ID #755).

As an initial matter, we cannot agree that Board Policy 09.125 confers unfettered discretion to Vick to remove out-of-district students at any time and for any reason. Board Policy 09.125 makes clear that the superintendent possesses discretion as to the *enrollment* and continued enrollment of out-of-district students. R. 19, Ex. A (Board Policy 09.125 at 1) (Page ID #117) ("A nonresident student may be permitted to enroll in the District's schools . . . [if] permission is granted by the Superintendent or Superintendent's designee."); *id.* ("The continued enrollment of nonresident students in the District's schools is subject to the recommendation of the school Principal and the approval of the Superintendent."). It does not, however, extend this discretion to a student's continued *attendance* at an Owensboro Public School District school. The

distinction between "attend" and "enroll" under Kentucky law is well-documented. In fact, the Kentucky Supreme Court recently explained this distinction by examining both the common understanding of the terms and their meanings as codified in the Revised Statutes. *Jefferson Cnty. Bd. of Educ. v. Fell*, — S.W.3d —, No. 2011-SC-000658-DGE, 2012 WL 4243659, at *5 (Ky. Sept. 20, 2012). The court first recognized that as defined by *Webster's II New College Dictionary* (1995) and the *American Heritage Dictionary of the English Language* (4th ed. 2006), the terms "'enroll' and 'attend' are not synonymous." *Id.* Enroll is defined as "[t]o enter the name of in a record, register, or roll"; whereas attend is defined as "[t]o be present at: attended class." *Id.* (internal quotation marks omitted). The court further noted that the legal definitions of these terms are similarly distinct under Kentucky Revised Statutes chapter 159. *Id.* at *7 ("[I]t is also evident that the legislature has distinguished 'enroll' from 'attend' in other parts of . . . KRS Chapter [(159)].").

As applied to this context, then, we understand the term "enroll" to refer to a student's registration at the beginning of the academic year and the term "attend" to denote a student's presence during the academic year. We thus conclude that Board Policy 09.125 confers to Vick the authority to deny an out-of-district student's application for enrollment at the beginning of the academic year, even if the student had enrolled as an out-of-district student in previous years, but it does not extend to Vick the power to remove unilaterally and without process a student from the Owensboro Public School District after the academic year has commenced.

Additionally, reading Board Policy 09.125 as vesting Vick with the limited discretion to approve enrollments at the commencement of an academic year comports with the Opinion of the Kentucky Attorney General 79-327 ("OAG 79-327"), which explains that "[o]nce a student is permitted to enroll in a nonresident school for a school year, we believe the law applicable to student conduct and the possibility of suspension and/or expulsion under KRS 158.150 comes into play." Ky. Op. Att'y Gen. 79-327, 1979 WL 33461 (1979). Further, OAG 79-327 expressly denotes revocation of out-of-district status as an expulsion: "Termination of the privilege of attending a nonresident

school during the course of a school year is in fact an expulsion and must be so handled and effected only after a hearing before the 'foreign' board of education." *Id.* Under this interpretation of Kentucky law, which we find persuasive, the defendants would have been required to hold a hearing prior to revoking G.C.'s out-of-district status.

The district court, however, declined to follow OAG 79-327, noting that Opinions of the Kentucky Attorney General are not binding on the courts. R. 85 (Order at 13 n.4) (Page ID #755). Instead, the district court relied on what it considered to be binding authority from our court, *Daniels v. Woodside*, 396 F.3d 730 (6th Cir. 2005). We disagree, though, that *Daniels* controls the analysis. Although the framework of the program in *Daniels* mirrors that of the out-of-district reciprocal agreement at issue here, the manner in which Daniels was precluded from participation in the program differs in a critical manner. *Id.* at 737 (explaining that the superintendent exercised discretion to admit students). Unlike here where G.C. was removed after the commencement of the school year, in *Daniels* the superintendent "denied Daniels's request for readmission" when Daniels "was required to seek re-enrollment for the following semester." *Id.* at 733. In *Daniels*, the superintendent was acting within his clear discretion to admit or deny students seeking readmission when he made the determination to deny Daniels's application. We thus concluded that Daniels was not denied due process. *Id.* at 737. Had Vick rejected G.C.'s August 2009 application to enroll in Owensboro High School for the 2009–10 academic year, *Daniels* would control. Because Vick removed G.C. during the academic year, however, *Daniels* is inapposite.

Moreover, the concept of de facto expulsions is not new to this court. *See, e.g.*, *Wayne v. Shadowen*, 15 F. App'x 271, 290 (6th Cir. 2001) (recognizing the constructive-expulsion argument, yet ultimately finding that the restriction at issue "was not tantamount to permanent and complete expulsion from the school system"); *Ashiegbu v. Williams*, No. 97-3173, 1997 WL 720477, at *1 (6th Cir. Nov. 12, 1997) ("It is initially noted that an indefinite suspension is the functional equivalent of a permanent expulsion."); *see also Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1012 (7th Cir. 2002) ("[W]hen a penalty that is tantamount to expulsion is involved, the school

authority must afford the student an opportunity to present evidence and argument in mitigation.") (internal quotation marks omitted). We therefore conclude that OAG 79-327 is not in conflict with our precedent.

Given that neither this court nor any Kentucky court has defined the term "expulsion" under § 158.150 or interpreted a reciprocal agreement such as that at issue here, we adopt the recommendation of OAG 79-327. The Kentucky courts rely frequently on Opinions of the Attorney General; in fact, the Kentucky Supreme Court recently underscored their importance, remarking that "[w]hile not binding on courts, Opinions of the Attorney General are considered highly persuasive and have been accorded great weight." *Carter v. Smith*, 366 S.W.3d 414, 420 n.2 (Ky. 2012). We thus conclude that G.C. has proffered evidence demonstrating that he was expelled from Owensboro High School. Moreover, as we have determined that under Kentucky law, all students are afforded due process prior to expulsion, regardless of their in-district or out-of-district status, the district court erred in granting the defendants' summary judgment motion on G.C.'s due-process claim. We therefore **REVERSE** the district court's due-process determination.

## IV. FOURTH AMENDMENT CLAIM

G.C. argues that the district court erred when it granted summary judgment to the defendants on his Fourth Amendment claim. G.C. conceded at oral argument that the March 2009 search of his cell phone was justified in light of the surrounding circumstances, yet maintains that the September 2009 search was not supported by a reasonable suspicion that would justify school officials reading his text messages. The defendants respond that reasonable suspicion existed to search his phone in September 2009 given his documented drug abuse and suicidal thoughts, particularly under the lower standard applied to searches in a school setting. Appellees Br. at 21–26. They argue that the searches were limited and "aimed at uncovering any evidence of illegal activity" or any indication that G.C. might hurt himself. *Id.* at 28.

The Supreme Court has implemented a relaxed standard for searches in the school setting:

> [T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry:  first, one must consider whether the action was justified at its inception; second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified the interference in the first place.

*New Jersey v. T.L.O.*, 469 U.S. 325, 341–42 (1985) (internal quotation marks, citation, and alterations omitted).  "A student search is justified in its *inception* when there are reasonable grounds for suspecting that the search will garner evidence that a student has violated or is violating the law or the rules of the school, or is in imminent danger of injury on school premises." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 495–96 (6th Cir. 2008).  "Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *T.L.O.*, 469 U.S. at 342.  "In determining whether a search is excessive in its scope, the nature and immediacy of the governmental concern that prompted the search is considered." *Brannum*, 516 F.3d at 497 (internal quotation marks omitted).  "In order to satisfy the constitutional requirements, the means employed must be congruent to the end sought." *Id.*

Because this court has yet to address how the *T.L.O.* inquiry applies to the search of a student's cell phone, the parties point to two district court cases that have addressed this issue.  In *J.W. v. DeSoto County School District*, No. 2:09-cv-00155-MPM-DAS, 2010 WL 4394059 (N.D. Miss. Nov. 1, 2010), the case relied upon by the defendants and cited by the district court, a faculty member observed a student using his cell phone in class, took the cell phone from the student, and "opened the phone to review the personal pictures stored on it and taken by [the student] while at his home." *Id.* at *1. The district court found the faculty member's actions reasonable, explaining that "[i]n assessing the reasonableness of the defendants' actions under *T.L.O.*, a crucial factor is

that [the student] was caught *using* his cell phone at school." *Id.* at *4. The court further reasoned that "[u]pon witnessing a student improperly using a cell phone at school, it strikes this court as being reasonable for a school official to seek to determine to what end the student was improperly using that phone." *Id.*

Such broad language, however, does not comport with our precedent. A search is justified at its inception if there is reasonable suspicion that a search will uncover evidence of further wrongdoing or of injury to the student or another. Not all infractions involving cell phones will present such indications. Moreover, even assuming that a search of the phone were justified, the scope of the search must be tailored to the nature of the infraction and must be related to the objectives of the search. Under our two-part test, using a cell phone on school grounds does not automatically trigger an essentially unlimited right enabling a school official to search any content stored on the phone that is not related either substantively or temporally to the infraction. Because the crux of the *T.L.O.* standard is reasonableness, as evaluated by the circumstances of each case, we decline to adopt the broad standard set forth by *DeSoto* and the district court.

G.C. directs the panel to *Klump v. Nazareth Area School District*, 425 F. Supp. 2d 622 (E.D. Pa. 2006), a case in which a student was seen using his cell phone, followed by two school officials accessing the student's text messages and voice mail; searching the student's contacts list; using the phone to call other students; and having an online conversation with the student's brother. *Id.* at 630. The court initially determined that the school officials were "justified in seizing the cell phone, as [the student] had violated the school's policy prohibiting use or display of cell phones during school hours." *Id.* at 640. The court found that the school officials were not, however, justified in calling other students, as "[t]hey had no reason to suspect at the outset that such a search would reveal that [the student] himself was violating another school policy." *Id.* The court further discussed the text messages read by the school officials, concluding that although the school officials ultimately found evidence of drug activity on the phone, for the purposes of a Fourth Amendment claim, the court must consider only that which the officials knew at the inception of the search: "the school officials

did not see the allegedly drug-related text message until after they initiated the search of [the] cell phone. Accordingly, . . . there was no justification for the school officials to search [the] phone for evidence of drug activity." *Id.* at 640–41. We conclude that the fact-based approach taken in *Klump* more accurately reflects our court's standard than the blanket rule set forth in *DeSoto*.

G.C.'s objection to the September 2009 search centers on the first step of the *T.L.O.* inquiry—whether the search was justified at its inception. G.C. argues that the school officials had no reasonable grounds to suspect that a search of his phone would result in evidence of any improper activity. The defendants counter that the search was justified because of G.C.'s documented drug abuse and suicidal thoughts. Appellees Br. at 26. Therefore, they argue, the school officials had reason to believe that they would find evidence of unlawful activity on G.C.'s cell phone or an indication that he was intending to harm himself or others. *Id.* at 26–27.

We disagree, though, that general background knowledge of drug abuse or depressive tendencies, without more, enables a school official to search a student's cell phone when a search would otherwise be unwarranted. The defendants do not argue, and there is no evidence in the record to support the conclusion, that the school officials had any specific reason at the inception of the September 2009 search to believe that G.C. then was engaging in any unlawful activity or that he was contemplating injuring himself or another student. Rather, the evidence in the record demonstrates that G.C. was sitting in class when his teacher caught him sending two text messages on his phone. R. 69-4 (Brown Aff. at ¶ 4) (Page ID #384). When his phone was confiscated by his teacher pursuant to school policy, G.C. became upset. *Id.* ¶ 3. The defendants have failed to demonstrate how anything in this sequence of events indicated to them that a search of the phone would reveal evidence of criminal activity, impending contravention

of additional school rules, or potential harm to anyone in the school.[1] On these facts, the defendants did not have a reasonable suspicion to justify the search at its inception.

The defendants further argue that G.C.'s claim must fail because he did not suffer any harm as a result of the search; specifically, they point to the fact that he "was not disciplined based on the contents of his phone." Appellees Br. at 28. However, the issue of injury and compensable damages has not been developed before us. Even if G.C. cannot establish compensable damages, he may be entitled to nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("[W]e believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury."); *Slicker v. Jackson*, 215 F.3d 1225, 1231 (11th Cir. 2000) ("We have held unambiguously that a plaintiff whose constitutional rights are violated is entitled to nominal damages even if he suffered no compensable injury."); *Briggs v. Marshall*, 93 F.3d 355, 360 (7th Cir. 1996) (recognizing that nominal damages are available for Fourth Amendment claims). Moreover, punitive damages sometimes attach to an award comprised solely of nominal damages. *See Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 645 (6th Cir. 2005) ("But this is a § 1983 case in which the basis for the punitive damages award was the plaintiff's unlawful arrest and the plaintiff's economic injury was so minimal as to be essentially nominal."). Therefore, we remand to the district court to address the issue of injury and damages in the first instance.

We therefore **REVERSE** the district court's grant of summary judgment as to G.C.'s Fourth Amendment claim based on the September 2009 search.

---

[1]The ordinary nature of the September 2009 infraction is highlighted further when contrasted with the March 2009 search, which G.C. has conceded was justified at its inception. Immediately prior to the March 2009 search, G.C. admitted to making a call on his cell phone in the school parking lot after having walked out of a meeting with the school prevention coordinator. R. 69-8 (Smith Aff. at ¶ 8) (Page ID #468). Upon his return, G.C. told Bell that he was having suicidal thoughts, and the security officer reported to Bell that there were tobacco products in plain view in G.C.'s car. *Id.* There was thus reason to believe—based on that day's sequence of events—that G.C. was contemplating injuring himself or breaking additional school rules. The defendants, however, can point to no such indications in the hours, weeks, or months leading up to the September 2009 search.

## V.  REHABILITATION ACT CLAIM

Finally, G.C. argues that the district court erred in granting summary judgment to the defendants on G.C.'s Rehabilitation Act claim.  G.C. asserts that "[u]nder the procedural protections of § 504, the School District is [obligated] under 'Child Find' to identify the student in their school system who may be eligible for special services."  Appellant Br. at 29.  However, merely asserting that the defendants failed to meet certain obligations under § 504 of the Rehabilitation Act and various regulations is insufficient to succeed on a Rehabilitation Act claim, particularly at the summary-judgment stage.  Rather, G.C. must proffer evidence that satisfies each of these four elements:

> (1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*Campbell v. Bd. of Educ. of Centerline Sch. Dist.*, 58 F. App'x 162, 165 (6th Cir. 2003) (citing *Doherty v. S. College of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988)).

The district court granted the defendants' motion for summary judgment for failure to produce evidence of the third element, that the actions of the defendants were discriminatory.  R. 85 (Order at 24–25) (Page ID #766–67).  As we have previously explained, "the Rehabilitation Act *further requires* that the [plaintiff] must ultimately prove that the defendant's failure to provide [the plaintiff] with a free appropriate public education was *discriminatory*.  Surmounting that evidentiary hurdle requires that either bad faith or gross misjudgment must be shown before a § 504 violation can be made out, at least in the context of education of handicapped children." *Campbell*, 58 F. App'x at 167 (internal quotation marks omitted).  On appeal, G.C. addresses this portion of the district court's order in a cursory manner:  "The Appellee[s] had full knowledge of the child's issues but failed to implement their obligation under 'child find[.']  The facts of [G.C.'s] tenure at [Owensboro Public School District] is a litany of bad faith and gross misjudgment of the [Appellees]."  Appellant Br. at 35.  G.C. cited no evidence in the

record to support this assertion. Nor did he reference any controlling case law; he relied solely on an out-of-circuit case reversing a district court's dismissal for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Id.* (citing *M.P. v. Independent Sch. Dist. No. 721*, 439 F.3d 865 (8th Cir. 2006)). The district court thus correctly granted the defendants' motion on G.C.'s Rehabilitation Act claim.

Because G.C. has not produced sufficient evidence in support of his Rehabilitation Act claim, we need not consider whether the district court erred in denying G.C.'s motion for a *Daubert* hearing. G.C. has not produced sufficient evidence in support of his § 504 claim, and therefore, consideration of the defendants' expert is unnecessary. We **AFFIRM** the district court's grant of summary judgment on G.C.'s § 504 claim.

## VI. CONCLUSION

For the reasons stated, we **REVERSE** the district court's grant of summary judgment on G.C.'s due-process claim and on G.C.'s Fourth Amendment claim based on the September 2009 search. We **AFFIRM** the district court's grant of summary judgment on G.C.'s Rehabilitation Act claim. We **REMAND** for further proceedings consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

ALAN E. NORRIS, Circuit Judge, concurring in part and dissenting in part. Truly, no good deed goes unpunished. The Majority recognizes that Superintendent Larry Vick had the authority to bar the re-enrollment of G.C. at Owensboro High School before the start of the 2009-2010 academic year. Principal Anita Burnette recommended such a course of action based upon G.C.'s record of disciplinary infractions. Plaintiff's own brief characterizes his behavior as "abhorrent." Rather than take this advice, Superintendent Vick put the student's wishes above those of Principal Burnette by giving him a final chance. Vick then met with G.C.'s parents in June of 2009 and outlined his concerns and expectations. Among other things, he told them that G.C. could enroll as a non-resident student for the next year "on the condition and understanding that, if he had *any* further disciplinary infraction, this privilege would be immediately revoked and he would be required to return to his home school district." R. 69-17 (Vick Aff. at § 11) (Page ID # 500). In short, despite any misgivings he took a chance on G.C.

And how was this largesse rewarded? G.C. violated school policy shortly after the commencement of the new school year by using his cell phone in the classroom. For that infraction, his out-of-district student status was revoked. G.C.'s parents were informed and told of their right to appeal the decision. School officials met with G.C.'s parents the following month to consider their request that their son be re-admitted. He was not. A layperson considering the actions of school officials might well conclude that G.C. had been fairly treated, that he had been given repeated opportunities to alter his behavior but had not taken advantage of them.

As lawyers, of course, we have come to recognize that what appears to be reasonable is not always legally sufficient. The Majority concludes that the district court erred when it held that G.C. did not have a property interest in an education within the Owensboro Public School District sufficient to trigger a right to due process. For the

reasons outlined by the Majority, I agree G.C. enjoyed the due process protections set forth in *Goss v. Lopez*, 419 U.S. 565 (1975), although it is not clear from that record whether the June 2009 meeting and subsequent consultations between the parties satisfied those due process protections. That question, however, is best left to the district court on remand.

While I concur in the Majority's resolution of the due process question, I must dissent from its decision with respect to the September 2009 search of G.C.'s cell phone. There is a reason that the Supreme Court in *New Jersey v. T.L.O.*, 469 U.S. 325, 341-42 (1985), concluded that the legality of a search in the school setting hinges on reasonableness in light of all the circumstances: school officials are acting *in loco parentis* and, as such, they have a keen interest in student welfare and safety. For that reason, they must be allowed more leeway under the Fourth Amendment than is appropriate outside the school setting.

What happened here? G.C. violated school policy by using his cell phone during class. Under the terms of that policy, his phone was seized, an action that he does not contest. The question then becomes, was a limited search of the phone's text messages permissible? The school official who conducted the search was aware of G.C.'s prior suicidal thoughts and drug use. She also knew that he had a history of disciplinary problems, which included fighting. Her duty as an administrator was to ensure the safety of the students, including G.C. Her subsequent search, which was limited to reading four text messages created that day, strikes me as reasonable under *T.L.O.* I respectfully dissent.