RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0226p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────

LAUREN GOHL, as next friend of J.G.,

          *Plaintiff-Appellant,*

    *v.*

LIVONIA PUBLIC SCHOOLS SCHOOL DISTRICT;
SHELLIE MOORE; NANCY RESPONDEK; SHARON
TURBIAK; DR. RANDY LIEPA; MAEGAN SPROW;
CAROL DEBAUDRY; CANDY SOKOL; ELIZABETH
SANTER; CYNTHIA DEMAN; TRACEY CREWS; DIANE
SLOBODA,

          *Defendants-Appellees.*

> No. 15-2301

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:12-cv-15199—Mark A. Goldsmith, District Judge.

Argued: August 4, 2016

Decided and Filed: September 8, 2016

Before: BOGGS, CLAY, and SUTTON, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Christopher P. Desmond, Detroit, Michigan, for Appellant. Robert G. Kamenec, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellee DeMan. Jonathon A. Rabin, HALL, RENDER, KILLIAN, HEATH & LYMAN, Troy, Michigan, for Appellee Turbiak. Gouri G. Sashital, KELLER THOMAS, P.C., Southfield, Michigan, for Appellees Livonia Public Schools, Liepa, Sokol, and Santer. **ON BRIEF:** Christopher P. Desmond, Detroit, Michigan, for Appellant. Robert G. Kamenec, Karen E. Beach, PLUNKETT COONEY, Bloomfield Hills, Michigan, Jonathon A. Rabin, HALL, RENDER, KILLIAN, HEATH & LYMAN, Troy, Michigan, Gouri G. Sashital, Thomas L. Fleury, KELLER THOMAS, P.C., Southfield, Michigan, Martin C. Brook, Donelle R. Buratto, Benjamin A. Anchill, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PLLC, Birmingham, Michigan, Kaveh Kashef,

1

CLARK HILL, PLC, Birmingham, Michigan, Megan K. Cavanagh, Boyd E. Chapin, Jr., Charles A. Harrison III, GARAN LUCOW MILLER P.C., Detroit, Michigan, for Appellees.

SUTTON, J., delivered the opinion of the court in which BOGGS, J., joined. CLAY, J. (pp. 16–34), delivered a separate dissenting opinion.

———————

**OPINION**

———————

SUTTON, Circuit Judge. Sharon Turbiak, a twelve-year special education veteran, taught a preschool class that required sensitivity to mentally and physically disabled children. The allegations contained in this lawsuit, filed by the mother of one of her students, suggest she had considerable trouble on that score, as do the school district's actions in firing her. The question at hand is whether her conduct also violated the United States Constitution, two federal statutes (the Americans with Disabilities Act and the Rehabilitation Act), and Michigan law. Because Gohl did not provide sufficient evidence from which a reasonable jury could find in her favor, as the district court concluded in a thorough 39-page opinion granting summary judgment to the defendants, we affirm.

I.

J.G. was born with hydrocephalus, a disorder that causes an unsafe buildup of fluid in the brain. He underwent numerous surgeries to correct or ameliorate the condition. At age three, his mother, Lauren Gohl, enrolled him in the morning session of the Moderate Cognitive Impairment Program at Webster Elementary School, which offered educational and therapeutic services for students like him. His teacher was Sharon Turbiak, a long-time special education teacher.

During the school year, Turbiak faced several complaints about her teaching (and her relationship with her colleagues) and one complaint about her teaching of J.G. In October 2011, a special-needs specialist approached the principal at Webster, Shellie Moore, and passed along some concerns from other staff members about Turbiak's classroom behavior. Moore looked into the issue and over the next few days catalogued concerns about Turbiak. According to

Moore, an occupational therapist reported that Turbiak's class was "a very uncomfortable place to work" and that some on Turbiak's team thought she was overly "harsh with [the] children, holding their faces or chins tightly and yelling in their faces." R. 184-9 at 2. A speech pathologist thought that Turbiak "used too much force by pushing on children's shoulders," and that the "lower functioning children in the classroom were frustrating to Ms. Turbiak and . . . were most vulnerable to possible rough treatment." *Id.* A paraprofessional called Moore in tears, worrying that Turbiak's bad behavior was "escalating." *Id.* An occupational therapist said that Turbiak was "gruff and abrupt"; that Turbiak once force-fed a gagging and crying student; and that Turbiak "picked up [children] from the floor by one arm and that there was the potential to dislocate a small shoulder." *Id.* Not one of these incidents, the parties agree, involved J.G.

On the advice of Cynthia DeMan, the Director of Personnel for Livonia Public Schools, Moore met with Turbiak to discuss her teaching. During the meeting, Turbiak admitted that she was "feeling unappreciated at Webster" and that she was "stressed out because of the level of disability of her students and the reduction of support." *Id.* at 3. Turbiak also explained that she was not as "touchy feely" as her co-workers, had high expectations for her students, and "wanted them to make gains while in her classroom." *Id.* The next morning, even though Moore told Turbiak not to question the members of her team, Turbiak called a meeting to find out who had complained to the administration. This did not help matters. Members of Turbiak's team went to Moore again, telling her about the meeting and adding that they feared retaliation.

The next day, November 2, 2011, Turbiak and her union representative met with DeMan. The meeting focused on Turbiak's strained relations with her colleagues rather than on mistreatment of students. DeMan sent Turbiak home for a few days and followed up with a consultation letter, which explained, at heart, that, if Turbiak was not more professional with staff and students, she would be subject to disciplinary action. The letter urged Turbiak to follow "best practices" and to avoid "laps[ing] into inappropriate behaviors with either staff or students." R. 123-8 at 2. But the letter did not specifically accuse Turbiak of abusing students.

The meeting helped. For four months, no one reported any mistreatment of students by Turbiak or complained about friction between her and other employees.

The peace ended on March 5, 2012, when a social worker, Diane Sloboda, saw Turbiak "grab [J.G.] by the top of his head and jerk it back quite aggressively. She also yelled 'You need to listen' very close to his face." R. 123-9 at 2. Sloboda told Principal Moore about the incident. Moore called the central office and was instructed to send Turbiak over that afternoon. Turbiak and her union representative met with DeMan and Dorothy Chomicz, a director of human resources. Turbiak denied any "grab[bing]" or "yell[ing]." R. 179-6 at 21. She said she was using a special education technique called "redirecting" to focus and hold J.G.'s attention after he threw a ring-stacking toy. *Id.* Consistent with this technique, she said she put her hand on the back of J.G.'s head "to keep [it] from bouncing around,"—a problem for J.G.—and "[s]poke directly" to him. R. 179-6 at 21. Chomicz, trained as a special education teacher and familiar with this technique, thought this sounded reasonable and sent Turbiak back to her classroom.

Later in March, one of Turbiak's paraprofessionals, Nancy Respondek, was accused of spanking a student (not J.G.), after which the school investigated the incident and whether Turbiak was behaving "in accordance with [the] guidelines" set forth in DeMan's November consultation letter. R. 123-12 at 2. After the investigation, the district placed Turbiak and Respondek on administrative leave.

Gohl filed this lawsuit on J.G.'s behalf, alleging that Livonia Public Schools, Turbiak, Respondek, Moore, and other members of the school system violated J.G.'s rights under federal and state law. The district court granted summary judgment for the defendants on Gohl's federal claims and declined to exercise supplemental jurisdiction over the state law claims.

## II.

On appeal, Gohl claims the district court should have allowed four sets of her claims to go to a jury: (1) the substantive due process claim against Turbiak; (2) the Americans with Disabilities Act and Rehabilitation Act claims against Livonia Public Schools; (3) the equal protection claims against all defendants; and (4) all of the claims involving municipal liability for Livonia Public Schools.

Our standard of review is not new. We construe the record in Gohl's favor. *T.S. ex rel. J.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). To fend off summary judgment, Gohl must

present evidence that would permit a reasonable jury to find in J.G.'s favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

(1) *Substantive due process claim.* Gohl maintains that Turbiak violated J.G.'s right to be "free from excessive force under the [Fourteenth] Amendment." Appellant's Br. 28. She premises the argument on two types of alleged abuse: the March 5 head-grabbing incident and exposure to a psychologically abusive teacher. We address each one separately.

The Due Process Clause of the Fourteenth Amendment protects individuals from the arbitrary actions of government employees, but "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quotation omitted). The question is "whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking the conscience." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (quoting *Hall v. Tawney*, 521 F.2d 607, 613 (4th Cir. 1980)); *see Domingo v. Kowalski*, 810 F.3d 403, 411 (6th Cir. 2016).

*Physical abuse.* We recently applied the "shocks the conscience" test to allegations just like Gohl's. In *Domingo*, the parents of disabled students challenged a similar use of physical force—a special education teacher's use of the redirection technique that Turbiak used on March 5 with J.G. 810 F.3d at 408 (explaining that the teacher was "grabbing the student's face, squeezing his or her cheeks, and pointing the student's face toward" her). In rejecting the parents' claim, we adopted the Third Circuit's "useful, though not necessarily exhaustive" analysis of the "shocks the conscience" standard in public schools, asking four guiding questions: (1) "Was there a pedagogical justification for the use of force?" (2) "Was the force utilized excessive to meet the legitimate objective in this situation?" (3) "Was the force applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?" And (4) "Was there a serious injury?" *Id.* at 411 (quoting *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 173 (3d Cir. 2001)). Just as these factors precluded relief as a matter of law in *Domingo*, they preclude relief here.

As to the first consideration—pedagogical justification—Turbiak had one. Unrebutted testimony reflects that Turbiak used an established special education technique, "redirection," to make J.G. pick up a ring-stacking toy he had knocked off a table. Turbiak said so in her meeting with DeMan and Chomicz immediately after the incident. She said so again in her deposition. And Gohl offers no evidence to refute the claim. Requiring a child to clean up a mess he made not only fits with a common-sense understanding of what teachers typically do, but it also fits with the demands of J.G.'s Individualized Education Program—as provided under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400. Whatever one thinks about the timing or manner in which Turbiak used this technique here, no one can credibly deny that Turbiak had a pedagogical purpose in using it.

As to the second factor—excessiveness—we agree with Gohl that a reasonable jury could conclude that Turbiak used more force than needed. Turbiak's action bothered Sloboda, the only adult witness, enough for Sloboda to report it to the principal. Turbiak denies that she "grabbed" or "yelled," but in a she-said/she-said dispute at summary judgment, our standard of review settles the issue. We view the evidence in the light most favorable to Gohl and thus must accept Sloboda's version of events.

Even then, nothing about that account helps Gohl demonstrate that Turbiak wasn't making "a good-faith effort to maintain or restore discipline"—the third factor. This record does not permit a jury to find that Turbiak was acting "maliciously and sadistically for the very purpose of causing harm." She used an established technique to achieve a legitimate pedagogical goal, and, according to Turbiak's unrebutted testimony, she achieved it. J.G. "willingly picked up the ring stackers" after being redirected. R. 184-10 at 260.

The last question is whether there was a "serious injury." There was not. Sloboda said she saw Turbiak "letting [J.G.'s] head go. [J.G.] did not appear to be in distress. He gave no scream or cry. When his head returned back down he did not indicate that he was in any—in pain or in discomfort." R. 184-8 at 32. Nor did any physical injury ever show up. True, in *Domingo* we refused to endorse a "bright-line rule" requiring evidence of physical, rather than psychological, injury. 810 F.3d at 415. To that end, Gohl, in her deposition testimony, implied that J.G. was psychologically harmed by the head-grabbing incident. But Gohl testified that

J.G.'s psychological symptoms began only after he left school for the summer, and there is no evidence in the record suggesting that Turbiak's actions would have caused psychological symptoms with such a delayed onset.

That leaves just one of the four factors favoring Gohl. No doubt this is not a counting exercise, and at any rate the list of factors is not exhaustive. All of this makes comparisons to similar cases helpful—perhaps most helpful. *Domingo* awarded summary judgment to a special education teacher accused of acts ranging from too-forceful "redirection" of her students to gagging a student and binding him to a gurney. Judge Boggs dissented in part, arguing that the binding and gagging incident presented a genuine issue for a jury. *Domingo*, 810 F.3d at 417 (Boggs, J., dissenting). But he agreed—the court was unanimous on this point—that under the circumstances "grabbing [a] student's face, squeezing his or her cheeks, and pointing the student's face" could *not* have shocked the conscience. *Id.* at 408 (majority opinion). The head-grabbing incident here mirrors the head-grabbing incident in *Domingo* and involves far less illegitimate force than the act of binding a student to a gurney and gagging him. What was true in *Domingo* is true here. While Turbiak's "educational and disciplinary methods . . . may have been inappropriate" and "insensitive," they are not "unconstitutional." *Id.* at 416.

The March 5 head-grabbing also is less severe than the incident in *Lillard v. Shelby County Board of Education*, where we affirmed summary judgment in favor of a teacher who slapped a student without a legitimate pedagogical goal. 76 F.3d 716 (6th Cir. 1996). That episode didn't shock the conscience as a matter of law. Neither did this one.

*Webb v. McCullough*, 828 F.2d 1151, 1159 (6th Cir. 1987), does not lead to a contrary conclusion. In the midst of a class trip to Hawaii, a student locked herself in a hotel bathroom after being told she'd be sent home for drinking, breaking curfew, and having a boy in her room. Her angry chaperone burst through the bathroom door, which struck the student and knocked her to the floor, after which he "grabbed [her] from the floor, threw her against the wall, and slapped her." *Id.* at 1154. Because "the record d[id] not demonstrate that the alleged blows . . . were in any way disciplinary," *id.* at 1158, those acts were malicious in a way that forceful "redirecting" surely is not. The district court correctly rejected this claim.

*Psychological abuse.*    Gohl also insists that J.G. was psychologically injured by Turbiak's bullying of other students, even if not by the March 5 incident directed at J.G.  We disagree for two reasons.

First, Gohl has not presented enough evidence for a reasonable jury to conclude that J.G. was injured at all.  The only expert authority in support of Gohl's psychological injury theory is the report from Dr. Sharon Hall, which says that behavior like Turbiak's "may" cause students to be psychologically harmed.  R. 206-12 at 27–28.  But that expert, who is not a psychologist, never examined J.G.  And that expert never opined that the possibility of psychological injury ("may" cause an injury) became a reality here (did cause an injury).  The only evidence of any effect on J.G. is Gohl's testimony that, starting in the summer *after* J.G. left Webster Elementary, J.G. began to exhibit "anxiety, opening and closing anything and everything, having things done a certain way or panic, panic. . . .  And still, to this day, he grabs my face to get my attention. . . . [I]t's a daily thing."  R. 209-5 at 20–21.  That evidence does not suffice for a reasonable jury to find a psychological injury at all, much less a serious injury traceable to Turbiak.

Second, the novelty of Gohl's theory of injury means that she cannot overcome Turbiak's qualified immunity.  Government employees are generally shielded from civil liability unless their conduct violates a clearly established constitutional right such that a reasonable official would have known that his conduct was unlawful.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  The Fourteenth Amendment's right to be free from excessive force may include, we have said, protection from *physical* force that causes only psychological injury.  *Domingo*, 810 F.3d at 415–16.  But we have never said that purely psychological bullying can suffice to shock the conscience.  And we certainly have not said so with clarity that "place[s] the . . . constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.  That necessarily means that the right Gohl asserts is not clearly established, making Turbiak eligible for qualified immunity.

(2) *Americans with Disabilities Act and Rehabilitation Act claims*.  The Americans with Disabilities Act and the Rehabilitation Act combat discrimination against disabled individuals.  Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act provides that a qualified individual with a disability shall not, "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Each Act allows disabled individuals to sue certain entities, like school districts, that exclude them from participation in, deny them benefits of, or discriminate against them in a program because of their disability. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015); *cf. G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013).

Gohl's statutory claims fail for two reasons. She has not provided enough evidence for a reasonable jury to find that J.G. was denied participation in or a benefit of his education program, and she has failed to show that any of the challenged actions occurred "because of" or "solely by reason of" J.G.'s disability.

*Denial of benefits*. Gohl has plenty of evidence that Turbiak was a bad, perhaps even abusive, teacher when it came to other students. But she has not provided any evidence indicating that Turbiak's failure to meet the ideals of her profession translated into a denial of any educational benefit to J.G.

Gohl tried to present three types of evidence below on this score. The district court refused to consider one of them, a report by psychologist Dr. Gerald Shiener, because it was unsworn and thus was inadmissible hearsay. We cannot consider it because a jury couldn't consider it either. *See Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 481 (6th Cir. 2008). Gohl does not dispute the point.

That leaves the Hall report and Gohl's deposition testimony. Hall based her report exclusively on a report by a school investigator, not on any individual assessment of J.G., and the report at any rate asserts only that Turbiak's alleged behavior "may" cause students like J.G. to be psychologically harmed. R. 206-12 at 27–28. Hall does not say that J.G. himself was harmed, and neither we nor a jury can infer injury from the mere possibility of injury. Nor does Gohl's testimony about her son's behavior suffice to establish the denial of an educational

benefit. Gohl testified that J.G. began to exhibit "[a]nxiety" and even "panic" starting in the summer after he left Webster Elementary. R. 209-5 at 20. Gohl is of course qualified to testify about changes in her son's behavior. But she lacks the information to establish that those changes are evidence of injury in the classroom, or the qualifications to establish that the behavioral changes she identifies are evidence of harm at all, rather than cognitive development.

Supporting this conclusion is the considerable evidence that J.G. made exactly the progress during the year that his mother, his therapists, and school administrators hoped he would make. Like many disabled students, J.G. had an "individualized education program" built and honed by his mother, teachers, therapists, specialists, and administrators. *See Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 519 (2007). These programs require regular meetings and regular progress reports. *See* 20 U.S.C. § 1414(d). His progress reports indicated that J.G. "made nice gains in imitation," showed increased "willingness to participate," lengthened his "attention span," and "show[ed] new skills on a daily basis." R. 127-10 at 2–3; R. 127-9 at 2. "[His] behavior [] improved tremendously," and he grew "leaps and bounds with his overall demeanor." R. 127-10 at 3.

Gohl does not dispute that progress. She claims only that he would have progressed further if he had been in a more nurturing classroom. Appellant's Br. 25. But there's too little evidence to back up that speculation. There is scant evidence, as shown, of psychological harm to J.G. And nothing in the progress reports suggests that his development was less than it should have been given his disability. Without any admissible testimony from a psychologist, and without any indication that J.G.'s expected progress was hampered, a reasonable jury could not find that he was discriminated against, excluded, or denied the benefits of his special education program. Were it otherwise, one might have expected Gohl to raise a claim under the most directly applicable federal statute—the Individuals with Disabilities Education Act—which guarantees J.G. a "free appropriate public education." 20 U.S.C. § 1400(d)(1)(A). No such claim was raised.

*Causation*. Gohl's claims fail for another, independent reason: she cannot meet the causation requirement. Both the Americans with Disabilities Act and the Rehabilitation Act require the challenged discrimination to occur *because of* disability, which is another way of

saying that the plaintiff must establish a but-for relationship between the protested act and the individual's disability. *See, e.g.*, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2527–28 (2013); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–15 (6th Cir. 2012) (en banc). The Americans with Disabilities Act requires the plaintiff to present sufficiently "significant" evidence of animus toward the disabled that is a but-for cause of the discriminatory behavior. *Anderson*, 798 F.3d at 357 & n.1 (quotation omitted). The Rehabilitation Act sets the higher bar, requiring plaintiffs to show that the defendant's acts were done "*solely* by reason of" the disability. *G.C.*, 711 F.3d at 635 (emphasis added) (quotation omitted). The distinction between the two requirements is of no moment here. Either way, the record would not permit a reasonable jury to find that discrimination against J.G.'s disability was a but-for cause, much less the sole cause, of Turbiak's conduct or the school's response. *Id.*

As with many civil rights laws, the claimant may defeat a summary judgment motion through an indirect or direct showing of discrimination. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178 (2009). To proceed with an indirect case, Gohl must meet the requirements of the familiar *McDonnell Douglas* test, which we have applied to these statutes. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184–85 (6th Cir. 1996); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under that framework, the plaintiff must first establish a prima facie case of discrimination: that he (1) is disabled under the statutes, (2) is "otherwise qualified" for participation in the program, and (3) "is being excluded from participation in, denied the benefits of, or subjected to discrimination" because of his disability or handicap, and (4) (for the Rehabilitation Act) that the program receives federal financial assistance. *G.C.*, 711 F.3d at 635 (quotation omitted); *see Monette*, 90 F.3d at 1186. In an indirect case, the third factor's causality requirement demands a showing that similarly situated non-protected students were treated more favorably. *See Shah v. Gen. Elec. Co.*, 816 F.2d 264, 268 (6th Cir. 1987). If she satisfies those obligations, the burden shifts to the school to offer a "legitimate, nondiscriminatory" reason for its actions. *Monette*, 90 F.3d at 1179, 1185. If the school does so, the burden shifts back to Gohl to establish that the school's proffered reason is merely a pretext for unlawful discrimination. *Id.* at 1186–87.

Gohl's indirect case fails because she cannot meet the "requirement[] [that] a prima facie claim of disparate treatment" under *McDonnell Douglas* include evidence that a "comparable non-protected person was treated better." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir. 1992) (quotation omitted). As Gohl seems to acknowledge, there is no evidence in the record about how *any* "comparable non-protected" people were treated. *See* Appellant Br. 39–40. In the absence of evidence of a well-treated comparator, Gohl cannot prove that discrimination against the disabled was the reason for Turbiak's mistreatment. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 709 (6th Cir. 2006). Apparently realizing that she cannot meet the standard for a prima facie case under *McDonnell Douglas*, Gohl does not bother to argue that the school's defenses are pretextual.

This lack of comparators, we recognize, is no fault of Gohl's. The circumstantial-evidence path, designed by *McDonnell Douglas* to make life easier for claimants in terms of establishing often-elusive evidence of discrimination, does not work well in all settings. In particular, it offers little help in the context of a claim involving a teacher who works only with individuals in a protected group, whether a teacher who works only with disabled students or a teacher who works only with students of one religious group. The comparator requirement is the be all and end all of the circumstantial-evidence test. If there are no comparators, there is no way to deploy it.

That leaves Gohl to make a direct case of discrimination. To move past summary judgment through the direct method, Gohl need not meet the comparator requirement of *McDonnell Douglas*. Rather, she must simply produce enough evidence of discrimination to persuade a reasonable jury that animus was a but-for cause of the challenged act. *See Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). The labels we might attach to evidence—"direct" or "indirect"—do not matter. Evidence counts as long as it is relevant to the purported reasonable jury's inquiry. *See Ortiz v. Werner Enters., Inc.*, No. 15-2574, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016). "Evidence is evidence," and it "must be considered as a whole." *Id.*

The record does not contain any traditional direct evidence, no smoking gun as it were, that Turbiak or other school officials intentionally mistreated disabled students because they were disabled. *See Amadeo v. Zant*, 486 U.S. 214, 226 (1988). "Direct evidence explains itself."

*Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013). It "does not require the fact finder to draw any inferences to reach the conclusion that unlawful discrimination was at least a motivating factor." *Id.* No such evidence exists here.

While Gohl does offer what amounts to circumstantial evidence in support of her claim, it does not indicate that disability caused the alleged abuse—when Turbiak grabbed J.G.'s head, jerked it back, and yelled at him. Her key evidence is the timeline that Moore constructed in October. It noted that "lower functioning children in the classroom were frustrating Ms. Turbiak and . . . were most vulnerable to rough treatment," and that Turbiak was "gruff and abrupt," particularly with the "lower functioning students." R. 184-9 at 2. It also noted that Turbiak was "feeling unappreciated at Webster" and was "stressed out because of the level of disability of her students and the reduction of support." *Id.* at 3. DeMan's counseling letter from early November acknowledged that Turbiak's work "can be frustrating and at times possibly overwhelming." R. 123-8 at 2.

These statements would not permit a jury to conclude that disability was a but-for cause of the head-jerking incident. Consider the context. Teaching disabled preschoolers is difficult work, and Turbiak's job was not made easier by the fact that she did not get along with her colleagues and had a different teaching philosophy from others on her team. Frustration and gruffness in those circumstances do not equal discrimination. Gohl's theory also requires considerable conjecture: to suppose that Turbiak chose to become a special education teacher in order to help disabled kids, to suppose that she stood by this objective for over a decade, and to suppose that in year twelve she began discriminating against the same sorts of disabled students she had committed her career to teaching. That's a lot of supposing. And that's quite a conclusion. All of this stands against the possibility, experienced by most teachers at some point in their career, of getting tired of *all* students from time to time, as opposed to developing animus toward their physical, religious, or other characteristics. Anything can happen, we realize. And familiarity breeds all sorts of risks. But if Gohl wishes to argue to a jury that Turbiak set out to discriminate against the group she devoted a career to teaching and acted on that impulse in the head-jerking episode, she must show more than conjecture to obtain that opportunity.

Because the record would not permit a reasonable jury to find that Livonia Public Schools excluded, denied benefits to, or discriminated against J.G. "because of" or "solely by reason of" his disability, Gohl's statutory claims fail as a matter of law.

(3) *Equal protection claims.* Gohl's equal protection claims fail for the same reason that her statutory claims fail: lack of evidence of discrimination. The Equal Protection Clause requires the States (and their subdivisions) to treat like people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see* U.S. Const. amend. XIV, § 1. Disparate treatment "based on disability" violates the Equal Protection Clause if it "lack[s] a rational relationship to a legitimate governmental purpose." *Tennessee v. Lane*, 541 U.S. 509, 522 (2004).

In bringing this claim, Gohl assumed "the burden of showing that [the defendants] intentionally treated [J.G.] differently—because he is disabled—than similarly situated students who were like him in all relevant respects." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 458 (6th Cir. 2008). Gohl has not met this burden. *See Marie v. Am. Red. Cross*, 771 F.3d 344, 361 (6th Cir. 2014). As noted, Gohl did not provide any evidence about how similarly situated non-disabled students were treated. Nor has she pointed to evidence that could persuade a jury that any of the challenged abuse occurred *because of* J.G.'s disability. Gohl's equal protection claims thus fail for the same reasons that her Americans with Disabilities Act and Rehabilitation Act claims do.

(4) *Municipal liability.* No one is liable for a constitutional violation that never occurred. That includes local governments. Under § 1983, municipal liability attaches "only" if "a custom, policy, or practice attributable to the municipality was the 'moving force' behind the violation of the plaintiff's constitutional rights." *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) (quotation omitted); *see Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). But we need not examine the customs, policies, or practices of the school district if no constitutional violation occurred. *See Graves v. Mahoning Cty.*, 821 F.3d 772, 776 (6th Cir. 2016). Because J.G.'s constitutional rights remain intact, Livonia Public Schools cannot be liable for violating them.

A few respectful words are in order in response to Judge Clay's dissent. At this stage of a case, we must view the evidence in the light most favorable to the nonmoving party, not reallocate the burden of proof and not use evidence that even Gohl admits she doesn't have.

Even Gohl acknowledges she hasn't produced evidence of how any comparable non-disabled students were treated. *See* Appellant Br. 39–40. That means we cannot make assumptions about what did or did not happen "to students without disabilities." Dissent 16. The dissent quotes liberally from Judge Boggs's separate writing in *Domingo* but overlooks, first, Judge Boggs's agreement with the majority that the use of redirection did *not* shock the conscience in that case, and second, the careful factual distinctions that Judge Boggs insisted on there and that we insist on here. Last, and most prominently, the dissent blurs the line between evidence of mistreatment of *other* students with evidence of mistreatment of J.G. (of which there was just one incident).

The appropriate standard of review in this case permits the conclusion that Turbiak was not a good teacher—indeed a poor one. And it explains why the school district fired her. But it does not permit us to draw inferences and conclusions that the record and the law cannot support and inferences that even the plaintiff does not ask us to draw.

For these reasons, we affirm.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting. If you read only the majority opinion, you would think that this is an open and shut case. But here is what the majority downplays or leaves out completely. J.G., like several other of Sharon Turbiak's disabled students—the ones she treated "like animals" (R. 206-2, Schultz Report, PageID# 8144)—had a target on their backs. The things that happened to them—being force-fed while crying and gagging, being screamed at in their faces, being violently grabbed and pushed to the ground, being put in restraints made of potato chip cans, having their chairs pulled out from under them, or being otherwise humiliated and treated like something less than human—happened for the simple reason that Turbiak liked "to target lower functioning students." (*Id.* at 8143.) After all, Turbiak had, as she put it, "a sick sense of humor." (*Id.* at 8136.)

Despite this, and despite the fact that none of these things happened to students without disabilities, the majority has decided that Lauren Gohl's claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, should not go to the jury. At the same time, the majority rejects the possibility that a jury could reasonably find that J.G. suffered adverse educational effects as a result of Turbiak's abuse. But the majority does not stop there. It goes on to state that no jury could find excessive force when a special education teacher grabs a severely brain injured three-year-old child by the head and violently jerks it back.

All told, the majority's approach to this case—from ignoring some of the most important facts, to drawing inferences in favor of the wrong party—would make it almost impossible for a plaintiff in a disability discrimination case to get her case to the jury. And getting to a jury should be nowhere near as difficult as the majority makes it; all a plaintiff should need to do is present enough evidence to create a genuine issue of material fact for each of her claims. Since Gohl has done exactly that, summary judgment should never have been granted. This case should therefore be reversed and remanded.

I.

The majority does not tell the full story. For one, J.G.'s medical condition is far more serious than the majority lets on. His disability, a brain condition called hydrocephalus, is characterized as "severe" and J.G. himself is described as being "medically fragile." (R. 127-9, Student Services Report, PageID# 1815; R. 177-7, Respondek Deposition, PageID# 3977.) J.G. has undergone several surgeries to his head, including having a retroperitoneal shunt implanted in his brain. As a result, any severe head movement could be life threatening to him. Because of the seriousness of J.G.'s condition, his mother, Gohl, made sure Turbiak knew "that [J.G.'s] head area was very fragile" when she enrolled him in Turbiak's classroom at Webster Elementary School. (R. 179-9, Respondek Deposition, PageID# 4449.)

The majority also downplays the extent of concern over Turbiak's classroom behavior. Beginning in October 2011, approximately two months into J.G.'s school year, various school employees began making complaints about Turbiak to Shellie Moore, Webster Elementary School's principal. Beth Santer, a specialist in the school's Moderate Cognitive Impairment Program, told Moore that several employees were concerned about the climate of Turbiak's classroom, pointing out that Turbiak "was harsh to students . . . [and] yelled loudly in their faces." (R. 184-9, Moore's Timeline of Events, PageID# 6212.) Another employee, Tracey Crews, reported similar behavior by Turbiak: "[she was] being harsh with children, holding their faces or chins tightly and yelling in their faces." (*Id.*)

Other employees reported that Turbiak was not only verbally abusive, but physically abusive as well. Meagan Sprow told Moore that "when [Turbiak] placed children in time out . . . she used too much force by pushing on children's shoulders." (*Id.*) Sprow also said that when it came to children with mobility issues, Turbiak "had a pattern of letting them fall rather than to support their transition to a chair or the floor." (*Id.*) Candy Sokol, who was assigned to Turbiak's classroom to work as a paraprofessional, called Moore in tears because she thought Turbiak's behavior was "escalating." (*Id.*) Moore described her conversation with Sokol in the following way:

> [Sokol] stated that she was afraid that Mrs. Turbiak was escalating and that she had said something to the effect that she (Mrs. Turbiak) thought it was a good

thing that [the] administration believed she had a warm and nurturing classroom and didn't know that they hit kids around in the classroom. This type of humor upset [Sokol] I believe because she feels that children are treated roughly in the [class]room.

(*Id.* (parenthesis in original).)

A different employee, Carol DeBeaudry, reported an incident where Turbiak force-fed cereal to one of her disabled students while that student cried and gagged. DeBeaudry reported another incident where "children were picked up from the floor by one arm . . . [causing] the potential to dislocate a small shoulder." (*Id.*) As DeBeaudry observed, "Turbiak appeared more harsh and abrupt with the lower functioning students." (*Id.*)

On October 31, 2011, several days after receiving these complaints, Moore approached Cynthia DeMan, the Livonia Public School District's director of personnel, to report what had happened. DeMan advised Moore to speak directly with Turbiak, which Moore then did. During the one and a half hour meeting between Turbiak and Moore, Turbiak cried off and on while explaining that she was "stressed out because of the level of disability of her students and the reduction of support." (*Id.* at 6213.) Turbiak acknowledged that she could be "loud and abrupt" with her students, but insisted that it was for their own good. (*Id.*) Turbiak said that she would change the way she did things in her classroom and that she "wouldn't be touching any child." (*Id.*) But Moore advised otherwise: "I told her that I thought rather than institute sudden changes in the routine in her classroom, that she take a few days to process this information and that I would support her as the year continued. I hugged [her] as she was leaving my office." (*Id.*)

Moore also told Turbiak not to question her colleagues about who had reported these incidents, but Turbiak did not listen. The day after her meeting with Moore, Turbiak called a meeting with several members of her classroom team to find out who reported her. She told her team that she could no longer trust anyone, and threatened that "she was going to do everything in her power to find out who had spoken to [Moore]." (*Id.*) She also threatened that she would question each person on her team "until someone grew the balls" to come forward. (*Id.*) Towards the end of the meeting, though, Turbiak assured her team that "she will no longer

touch/put [her] hands on [J.G.]." (R. 129-19, Schultz Report, PageID# 2137.) Turbiak's meeting only made things worse, as members of Turbiak's team went back to Moore, this time expressing fears of retaliation.

The majority also fails to mention the school district's hardly doing anything about Turbiak's behavior. Although DeMan (the district's personnel director), met with Turbiak and her union representative a few days after being approached by Moore, the meeting was mainly held to discuss Turbiak's relations with her colleagues, rather than her behavior towards students. DeMan made a number of recommendations for how Turbiak could "restor[e] a solid working relationship" at Webster Elementary School, but none of these recommendations addressed the allegations of physical abuse by Turbiak against her students. (R. 179-27, DeMan Memorandum, PageID# 4633-34.) And while DeMan did tell Randy Liepa, the district's superintendent, that there was a "situation" involving Turbiak, all Liepa said was that he wanted to be kept informed. (R. 177-3, DeMan Deposition, PageID# 3893-97.)

The next notable development occurred in March 2012, when Sokol was told by Santer that there were weekly complaints against Turbiak. Then, on March 5, 2012, Diane Sloboda, a social worker at Webster Elementary School, walked into Turbiak's classroom as Turbiak was grabbing J.G. by the head, jerking it back, and yelling in his face. Sloboda later described what she saw in a letter to Moore:

> At around 9:30 a.m.[,] I opened the pre-school classroom door and entered the room looking for our psychologist. Once inside I saw [Turbiak] grab [J.G.] by the top of his head and jerk it back quite aggressively. She also yelled[,] "You need to listen" very close to his face. After the incident she realized I was watching and quietly went back to assisting another student. A paraprofessional was also in the room although I am uncertain of whether or not she saw what had happened.
>
> I realize we all may have moments of frustration when working with special needs children. However, I feel it is extremely important to have a personal plan that will allow someone a way to express those feelings appropriately and not take them out on the students.

(R. 177-26, Sloboda's Statement, PageID# 4143.)

After hearing what had happened from Sloboda, Moore called the school district's administrative office and spoke with either DeMan or Dorothy Chomicz, a co-director of human

resources.  Moore was told to "[s]end [Turbiak] over."  (R. 179-6, DeMan Deposition, PageID# 4352.)

Turbiak and her union representative met with DeMan and Chomicz to discuss what Sloboda had reported seeing.  Turbiak denied grabbing J.G. by the head or yelling in his face; rather, she said she was using a technique called "redirecting," in order to "keep [J.G.'s] head . . . from bouncing around" after she saw him throw a toy.  (*Id.* at 4353.)  Because Chomicz thought Turbiak did nothing improper, she sent Turbiak back to her classroom:

> After discussing what we had heard and what we heard from Shellie Moore and what we read and our - my discussion with [Chomicz], who is a – also a special ed[ucation] teacher, that's one of her certifications, and she talked about redirecting and this is what you do sometimes and she sent her back.

(*Id.* at 4352.)

Just a few weeks later, on March 20, 2012, Turbiak was at it again.  This time, Sokol, the paraprofessional assigned to Turbiak's classroom, was in Turbiak's classroom along with Turbiak, DeBeaudry, and Nancy Respondek, another paraprofessional.  While they were all in the classroom together, a special needs student named Cayden flipped over a table.  Turbiak and Respondek waited for DeBeaudry to leave the classroom.  Once DeBeaudry left the room, Turbiak announced, "[s]he's gone."  (R. 206-14, Sokol Deposition, PageID# 8380.)  Respondek then walked over to where Cayden was, grabbed him by the arm, spanked him, and yelled into his face.  When Sokol tried to intervene, Turbiak told her that she was "being too nice and needed to yell."  (*Id.* at 8382.)  Two days later, Sokol reported what had happened to Moore.

## II.

Notably absent from the majority's opinion is any mention of the thirty-one page report prepared by Mark Schultz, the school district's safety officer, which describes a number of things Turbiak did to her special needs students.  (R. 206-2 at 8132.)  Schultz, who questioned Moore about why she had not contacted child protective services, learned about the following series of events through his investigation of Turbiak:

- Turbiak would restrain children in various ways.  Sokol described one of those incidents this way:  "[Turbiak] placed [a student named Hayden] into the bathroom for time out.

Hayden is confined to a wheel chair. This occurred numerous times and he was left unattended." (*Id.* at 8136.) Turbiak would also "use trays . . . as physical restraints in the classroom," and one time put "potato chip cans coated in a soft material over [another student's] arms so that [the student] could not cover her ears or get her hands to her face." (*Id.* at 8144.)

- Turbiak pulled a chair from beneath one of her preschool students as that student was sitting down, and when that student fell, Turbiak laughed and blurted out, "I have a sick sense of humor." (*Id.* at 8136.)

- Another employee reported that Turbiak "would repeatedly grab and forcefully slam students into time out. Time out was never a gentle discipline." (*Id.* at 8144.)

- One time, Sprow watched Turbiak "say to a staff member 'watch this' and then yell 'no' and laugh when [an] auditory defensive student . . . would cover her ears and start crying." (*Id.* at 8143-44.)

- Sprow also reported to Schultz that Turbiak "was rough" with her students and acted "outside the boundaries." (*Id.* at 8146.) Sprow recalled one incident where Turbiak pushed a student down. (*Id.*)

- While holding the hand of a student named Makayla, Turbiak let go of Makayla's hand so that Makayla would fall to the floor; and then Turbiak would laugh once Makayla actually fell. (*Id.* at 8143.)

- Turbiak seemed to especially pick on Makayla; she once force-fed Makayla while she cried and yelled. (*Id.*)

- Another time, Turbiak slapped Makayla's hand and then turned to Sprow, who witnessed that incident, and said, "you didn't see that." (*Id.*)

When describing some of these incidents, Sprow told Schultz that Turbiak "tends to target lower functioning students to be more physical and to yell at them." (*Id.*) Sprow also told Schultz that Turbiak "does not treat [special education] students with compassion or integrity." (*Id.* at 8144.) Instead, Sprow said, Turbiak "treats them like animals." (*Id.*)

Schultz also learned from Turbiak's co-workers that Turbiak tried to hide what she was doing. Turbiak would tell her co-workers that "what happens in preschool stays in preschool," and once said to one of her co-workers: "It's a good thing I do nice things for the parents, that way they don't hate me when I smack their kid around." (*Id.* at 8145, 8136.)

As a result of Schultz's investigation, Liepa, the district superintendent, recommended to the district's board of education that Turbiak be terminated. Liepa's June 12, 2012 letter to the

board referenced a number of specific incidents concerning Turbiak's adverse treatment of disabled students, and concluded with the following:

> Ms. Turbiak's behavior, taken individually or collectively, represents a violation of law and Board policy, constitutes a serious breach of her duties and obligations to the School District and its staff and students, displays a disregard for the special responsibilities of an educator, has had an adverse effect upon the School District, its staff and its students, and is inconsistent with the values the School District is attempting to teach.

(R. 189-3, Liepa Letter, PageID# 7271.)

Turbiak was ultimately fired by the school district. On June 13, 2012, the district also terminated Respondek for "inflict[ing] corporal punishment on a pre-school, special education student," and also for failing to report abuse. (R. 189-4, Respondek Termination Letter, PageID# 7273.) Several months later, in September 2012, the district issued written discipline to several other employees for failing to report abuse.

III.

Simply put, the district court should not have granted summary judgment to Defendants on all of Gohl's claims, and should have permitted this case to proceed to trial. To move past summary judgment, all that Gohl needed to do was to introduce enough evidence to create a genuine issue of material fact on each of her claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); Fed. R. Civ. P. 56(a). And the evidence in this case—especially when viewed in a light most favorable to Gohl (the non-moving party), as we are required to do, *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)—shows that Gohl did exactly that.

## A. *Gohl's ADA and Rehabilitation Act Claims*

The district court's first error, which the majority looks past, was dismissing Gohl's claims against the Livonia Public School District under the ADA, 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. The district court, after holding a three-day summary judgment hearing, concluded that there was no genuine factual dispute as to whether J.G. was

excluded from participation in, denied the benefits of, or subjected to discrimination under his school district's educational program because of his disability.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act likewise provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

"Apart from § 504's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452-53 (6th Cir. 2008) (internal brackets, quotation marks, and citation omitted). As this Court has put it, "the ADA and Rehabilitation Act cover largely the same ground." *R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cty., Ky.*, 637 F. App'x 922, 924 (6th Cir. 2016). Therefore, as the majority alludes to, this Court analyzes the two claims together. *See S.S.*, 532 F.3d at 452-53; *see also Thompson v. Williamson Cty.*, 219 F.3d 555, 557 n. 3 (6th Cir. 2000) (explaining that the plaintiff's ADA and § 504 claims may be analyzed together).

In order to prevail in her ADA and Rehabilitation Act claims against the school district, Gohl has to establish that J.G. is "(1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program by reason of his . . . disability." *S.S.*, 532 F.3d at 453 (citation omitted). Under the third factor, Gohl needs to show that the school district treated similarly situated, non-disabled students better than it treated J.G. *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977); *Shah v. General Electric Co.*, 816 F.2d 264, 268 (6th Cir. 1987) ("[I]ndividual disparate treatment . . . cases generally require indirect evidence from which an inference of discriminatory motive may be drawn, namely, comparative evidence demonstrating that the treatment of the plaintiff differs from that accorded

to otherwise similarly situated individuals who are not within the plaintiff's protected group." (internal quotation marks and citation omitted) (ellipses in original)).

Both the ADA and Rehabilitation Act require a plaintiff, like Gohl, to show "that the defendant took action *because of* the plaintiff's disability, i.e., the plaintiff must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (internal quotation marks, brackets, and citations omitted) (emphasis added); *see also Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc).

Once a plaintiff makes out a prima facie case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action. *Anderson*, 798 F.3d at 357. "If the defendant does so—and its burden is merely one of production, not persuasion—the plaintiff must then present evidence allowing a jury to find that the defendant's explanation is a pretext for unlawful discrimination." *Id.* (internal quotation marks, brackets, and citation omitted).

It is undisputed that J.G. is a qualified individual with a disability. The only dispute below, and on appeal, is the third element for an ADA or Rehabilitation Act claim, *i.e.*, whether J.G. was excluded from participation in, denied the benefits of, or subjected to discrimination under his school district's educational program because of his disability.

The majority thinks that Gohl's entire case comes down to whether J.G. made progress on his individualized education program ("IEP") goals. Essentially, what the majority opinion is saying is that because J.G. made progress on his IEP goals, Gohl cannot show that he was deprived of an educational benefit. *See* Maj. Opn. at 9-10. The district court said the same thing as its basis for dismissing Gohl's ADA and Rehabilitation Act claims. *See Gohl v. Livonia Pub. Sch.*, 134 F. Supp. 3d 1066, 1076 (E.D. Mich. 2015) ("J.G.'s IEP goals provide some fairly specific benchmarks, such as improving work habits, developing feeding and eating skills, developing perceptual discrimination and conceptual skills, and demonstrating emerging language skills. However, Plaintiff points to no evidence that J.G. was blocked from meeting

any one of those specific goals. To the contrary, the record evidence confirms progress in meeting those goals.") (internal quotation marks and citations omitted).

By trying to frame the inquiry as one involving whether J.G. made progress on his IEP goals, the majority takes much too narrow a view of the evidence. What the majority fails to appreciate is that the inquiry here, *i.e.*, whether J.G. was denied the benefits of his special education program, is broader than it is narrow. The district court made the same error. When it considered whether J.G. was denied the benefits of his special education program, the district court should have looked to the entire record, and not just to evidence that J.G. purportedly made some progress on his IEP goals. By failing to do so, the district court ignored most of the record and disregarded other evidence favorable to Gohl. *See, e.g.*, *Bomar v. City of Pontiac*, 643 F.3d 458, 462 (6th Cir. 2011) ("The facts as alleged by the plaintiff are not simply the facts that can be gleaned from the plaintiff's deposition testimony, but are rather the facts in the entire record, interpreted in the light most favorable to the plaintiff.") (Boggs, J., writing for the majority). But since this Court's review is *de novo* and it independently reviews the record, *see Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006), it does not matter for our review that the district court failed to consider the entire record—and the majority should not have been influenced by the district court's error.

There is, quite simply, another way to look at this case. What the district court should have focused on is all the evidence that Turbiak had created an abusive environment in the school district's special education program—one where her students either witnessed or were the targets of abuse at the hands of someone who was supposed to protect them. And a reasonable, even compelling, inference from the record is that Turbiak's abuse inhibited disabled children like J.G. from being educated appropriately.

Although Defendants refute this by pointing to J.G.'s academic progress, it is for the jury, not the court, to accept or reject Gohl's argument. A jury could, for example, conclude from the evidence that even if J.G. was not denied *all* educational benefit, he was still subjected to an impaired educational environment and suffered adverse educational effects as a result of Turbiak's abuse. A jury could find that J.G. achieved some educational gains despite the abuse, and yet conclude that he was nonetheless seriously hindered in his development, as evidenced by

the way he behaved at home. *See* R. 209-5, Gohl Deposition, PageID# 8544-45 (Gohl testifying that after she pulled J.G. out of Turbiak's classroom, J.G.'s "behavior was like a totally different person," as he was displaying signs of "[a]nxiety, opening and closing anything and everything, having things done a certain way or panic, panic."). And this would be a perfectly reasonable conclusion, as even the government's experts in the field have written that "[h]arassment of a student based on disability may decrease the student's ability to benefit from his or her education." *Reminder of Responsibilities under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act*, U.S. Dep't of Educ. (July 25, 2000), http://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html.

The point here is that a student can grow academically and still be denied the educational benefits that a school is supposed to provide. The two are not mutually exclusive. The purpose of the Livonia Public School District's special education program was to enable students with disabilities to achieve their highest performance possible, and we may never know the extent to which J.G.'s growth was impeded as a result of Turbiak's mistreatment. A jury should be permitted to decide whether being in an environment free of abuse and mistreatment would have enhanced J.G.'s progress, and there is certainly enough evidence in the record for a jury to make that determination.

There is, however, an even stronger reason why summary judgment should never have been granted in this case: the record is filled with evidence suggesting that J.G. was subjected to discrimination because of his disability. The majority opinion states that "[t]he record does not contain any direct evidence, no smoking gun as it were, that Turbiak or other school officials intentionally mistreated disabled students because they were disabled." Maj. Opn. at 12. And that is just completely belied by the evidence.

The record is full of disgusting things that Turbiak did to her disabled students, the ones she treated "like animals." (R. 206-2 at 8144.) She force-fed them as they cried and gagged; screamed in their faces; let children with mobility problems fall to the floor; grabbed and pushed them to the ground; put them in restraints made of potato chip cans; confined them to the school's bathroom; pulled their chairs out from under them; and subjected them to other forms of physical and mental abuse. And there is no mystery why Turbiak did these things: she had, by

her own account, a "sick sense of humor" and liked "to target lower functioning students." (*Id.* at 8136, 8143.)

The fact that none of these things happened to students without disabilities within the same school is all the evidence Gohl needs to survive summary judgment. A jury could look at the evidence and decide that because of Turbiak's animus toward disabled students, she intentionally treated J.G. differently from other students at Webster Elementary School, or even within the school district. These non-disabled students are similarly situated by virtue of attending the same school as J.G. and other disabled students. And it is J.G.'s experience as a disabled student at that school that defines the class of comparators on which Gohl's ADA and Rehabilitation Act claim rests. In other words, what defines the class of comparators is the disability status, or lack thereof, of students within the same school; this is contrary to the majority's strained argument that there is no basis for comparing disabled and nondisabled students unless they all simultaneously occupy the same classroom.[1]

The majority claims that there is another explanation for Turbiak's actions—namely, that she was "stressed out because of the level of disability of her students and the reduction of support." (R. 184-9 at 6213.) Whether that explains or excuses Turbiak's abuse of her students is something for the jury to decide, and not the district court in deciding a motion for summary judgment. Turbiak is free to argue her explanation to the jury, and the jury is free to accept or reject it.

The majority attempts to rely on Turbiak's twelve-year record as a special education teacher to call into question how someone who "chose to become a special education teacher in order to help disabled kids," and who "stood by this objective for over a decade" could actually do the things she is accused of doing. Maj. Opn. at 13. As the majority sees it, "[t]hat's a lot of

---

[1]The majority accuses the dissent of "reallocat[ing] the burden of proof" and relying on "evidence that even Gohl admits she doesn't have." Maj. Opn. at 15. Reallocating the burden of proof and relying on evidence that does not exist would be improper. However, what this Court is supposed to do is review the entire record and draw all reasonable inferences in Gohl's favor. The majority utterly fails to do that. Instead, the majority seems to be suggesting that Gohl prove a negative by adducing evidence that what happened to disabled students did not happen to students without disabilities. But the record clearly shows that in all the time Turbiak was abusing her disabled students, the school district received no complaints about any abuse being committed against students without disabilities; and the majority cannot seriously dispute that. Despite what the majority says, to get past summary judgment, Gohl need not adduce evidence about allegations for which there is no factual support.

supposing.  And that's quite a conclusion." *Id.*  To follow the majority's tortured logic, anyone who has ever been in a position of trust or access for a long time gets an automatic presumption in their favor.  That makes absolutely no sense.  No one would suggest, for example, that there would be "a lot of supposing" to think that someone married for twelve years could actually beat his wife, or that a priest of twelve years could actually molest one of his parishioners.  There is no mystery about what the majority is doing here:  it is "supposing" that Turbiak did not do what she is accused of doing, all because of how long she has been teaching.  But that sort of supposing is exactly what courts should not do in the context of summary judgment, where we examine the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor.

The majority's conjecture is completely belied by the record in this case.  The bottom line is that Gohl has presented more than enough evidence for a jury to reasonably find that J.G. was excluded from participation in, denied the benefits of, or subjected to discrimination under his school district's educational program because of his disability.  Gohl has established her prima facie case of discrimination, and since Defendants never offered a legitimate explanation for their actions, summary judgment should never have been granted.

**B.  *Gohl's § 1983 Substantive Due Process Claim Against Turbiak***

The district court again erred when it dismissed Gohl's claim against Turbiak for violating J.G.'s Fourteenth Amendment right to substantive due process, in violation of 42 U.S.C. § 1983.  As the majority indicates, Gohl's § 1983 claim is premised on the theory that Turbiak's grabbing J.G. by the head, violently jerking it back, and yelling in his face violated his due process right to be free from excessive force at the hands of his special education teacher. *See Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (public school students have the right "to be free of state intrusions into realms of personal privacy and bodily security") (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)).

The majority accepts the district court's opinion that Turbiak's conduct did not rise to the conscience-shocking level required for a substantive due process claim.  This Court recently explained that in order to raise a material issue of fact as to whether a teacher, such as Turbiak,

violates a student's right to be free from physical abuse, a plaintiff "must identify conduct that is so brutal, demeaning, and harmful as literally to shock the conscience." *Domingo v. Kowalski*, 810 F.3d 403, 410-11 (6th Cir. 2016) (internal quotation marks and citations omitted).

Much like this case, *Domingo* involved a special education teacher named Kowalski who was accused of abuse after gagging a student with a bandana, strapping another to a toilet, and forcing another to sit with her pants down on a training toilet in front of all her classmates. *Id.* at 406.[2] In assessing the plaintiff's Fourteenth Amendment claim, this Court adopted the Third Circuit's test for determining whether conduct shocks the conscience in violation of due process. *Id.* at 411. That test asks whether (1) there was a "pedagogical justification for the use of force," (2) the force utilized was excessive to meet a "legitimate objective," (3) the force was applied in a "good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm," and (4) there was a "serious injury." *Id.* (citing *Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 173 (3d Cir. 2001)).

The majority, like the district court below, fails to appreciate that what Turbiak did to J.G.—grabbing him by the head, jerking it back, and yelling in his face—must be considered against the backdrop of J.G.'s individual characteristics and severe disabilities. J.G. was three years old and suffered from hydrocephalus, a condition blocking the flow of fluid around his brain, causing it to accumulate in his skull. As a result of having this condition, J.G. is described as being "medically fragile," to the point where any severe head movement could be life threatening to him. (R. 177-7 at 3977.) As his teacher—the person Gohl trusted to care for her severely disabled three-year-old son for several hours a day—Turbiak knew how fragile J.G. was, and how easily something could go wrong. Yet despite that, Turbiak grabbed and violently

---

[2]The majority frames *Domingo* as one involving a teacher's use of the redirecting technique—the same technique that Turbiak claimed she used on J.G. *See* Maj. Opn. at 5-7; *see also* R. 179-6 at 4353 (deposition testimony explaining that Turbiak denied grabbing J.G. by the head or yelling in his face, and instead said she was using a technique called "redirecting," in order to "keep [J.G.'s] head . . . from bouncing around" after she saw him throw a toy.). The majority's description of the facts in *Domingo* is misleading to the extent it implies that the teacher in that case was using the redirecting technique on one of her students. The majority appears to be offering its own version of the facts; nowhere in *Domingo* is there any mention of the redirecting technique.

Furthermore, the majority attempts to use its discussion of the redirecting technique to bolster its argument even though there is no evidence in the record below that would suggest that there is an empirical basis justifying the use of the technique as a legitimate educational tool, or that the technique is widely accepted in the child development community.

jerked J.G.'s head—the place where he was most vulnerable. And this was done supposedly because Turbiak saw him throw a toy. All of this background and history must be considered in determining the viability of Gohl's excessive force claim against Turbiak; and when it is, there certainly is a genuine issue of material fact as to the objective reasonableness of Turbiak's actions.

At the same time, none of the *Domingo* factors preclude this case from going to a jury. With respect to the first factor—pedagogical justification—this Court explained that the question is "whether the teacher's allegedly unconstitutional conduct is properly *construed* as an attempt to serve pedagogical objectives." *Domingo*, 810 F.3d at 411 (internal quotation marks and citation omitted) (emphasis in original). In other words, there might be no constitutional violation where the teacher's conduct, even if improper, is "capable of being construed as having a disciplinary or educational purpose." *Id.* at 412 (citation omitted). Such was the case in *Domingo*, where even though Kowalski's strapping one of her female students to a toilet with a belt was "inappropriate" and "misguided," her "undisputed motivation was to assist [the disabled student] . . . to relax and properly use the toilet, and not to humiliate or punish her." *Id.* at 412-13.

Unlike *Domingo*, it is *not* undisputed in this case that Turbiak had a purely pedagogical motivation for what she did to J.G. Although the majority argues that Turbiak was motivated by a pedagogical interest—namely, correcting J.G.'s misbehavior in throwing a ring-stacking toy— a jury could find otherwise. A jury, for example, might well reject the notion that forcefully grabbing a brain-injured child by the head is related to teaching that child not to throw a toy. That same jury might look at all the evidence in the record—that Turbiak treated her disabled students "like animals," (R. 206-2 at 8144), or that she had, as she put it, "a sick sense of humor," (*Id.* at 8136), or that she once told her co-workers that "[i]t's a good thing I do nice things for the parents, that way they don't hate me when I smack their kid around," (*Id.* at 8145, 8136)—and find that under the circumstances, Turbiak's behavior is not capable of being construed as having a disciplinary or educational purpose. This alone makes summary judgment inappropriate. To quote from Judge Boggs' dissent in *Domingo*, Turbiak's grabbing J.G. by the head, aggressively jerking it back, and yelling in his face "could be found by a reasonable jury to

shock the conscience. At this stage we are not empowered to decide either that the action was or was not shocking on these facts, but merely whether there is a genuine issue." 810 F.3d at 417 (Boggs, J., dissenting in part).[3]

As to the second factor—excessiveness—even the majority acknowledges that a reasonable jury could find that Turbiak used more force than necessary. Again, the analysis here must take into account that Turbiak knew "[J.G.'s] head area was very fragile" (R. 179-9 at 4449); and a reasonable jury certainly could conclude that the force used on J.G. was excessive in light of what Turbiak knew about the three-year-old's medical condition.

Under the third *Domingo* factor, this Court must consider whether the force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. 810 F.3d at 411. This factor is closely tied to the first factor—whether there was a "pedagogical justification" for the use of force. *Id.* And, as already explained, a reasonable jury, looking at all of the facts in this case, could conclude that if Turbiak's behavior is not capable of being construed as having a disciplinary or educational purpose, that it was done for malicious or sadistic reasons. As Judge Boggs has put it, "if there were no legitimate pedagogical necessity for this action, then the significant degree of force employed could be taken by a reasonable jury to be malicious or sadistic." *Id.* at 417 (Boggs, J., dissenting in part).

The fourth factor—whether a "serious injury" occurred—presents a closer question. *See id.* at 411. As the majority correctly points out, "[t]here was not" a serious injury and Gohl does not argue otherwise. Maj. Opn. at 6. Nevertheless, this circuit has not "rigidly treated the existence of a serious injury as a mandatory requirement, but rather as evidence that force was excessive." 810 F.3d at 418 (Boggs, J., dissenting in part). *See, e.g.*, *Webb*, 828 F.2d at 1158-59 (denying qualified immunity even though the victim had no evidence of a serious physical injury because a jury could have found "that the alleged blows were a brutal and inhumane abuse of [the school principal's] official power, literally shocking to the conscience.); *McDowell v.*

---

[3]The majority surprisingly claims that the dissent overlooks "Judge Boggs's agreement with the majority" in *Domingo* that "the use of redirection did not shock the conscience in that case." Maj. Opn. at 15. This is a complete mischaracterization of *Domingo*. That case did not establish a "redirecting legal doctrine," which would exonerate a teacher from using a supposed pedagogical tool. The majority is simply pretending that Turbiak used an approved technique on J.G. and that Turbiak's behavior thus does not shock the conscience. However, these are questions of fact which are not suitable for disposition on summary judgment.

*Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (denying qualified immunity even though the victim "may not have suffered a 'serious or permanent injury' as a result of the alleged blows . . . [since] there was clearly no need for them.").

The same reasoning applies here. Because Turbiak was in a position of trust over J.G., and because it is possible that her actions were not disciplinary or educational in nature, a jury could find that under the circumstances, Turbiak's need to grab J.G. by the head "was so minimal or non-existent that" what she did was "a brutal and inhumane abuse of [her] official power, literally shocking to the conscience." *Webb*, 828 F.2d at 1159.

Moreover, the "serious injury" factor does not fully account for the fact that non-verbal, severely disabled children like J.G. may not be able to fully articulate the impact of abuse: "The fact that a child may have difficulty in expressing emotional disturbance from such treatment would counsel in favor of greater latitude, not less, in consideration of that factor. Otherwise the result is lessened protections, rather than heightened protections for disabled pupils as referenced in numerous decisions." *Domingo*, 810 F.3d at 418 (Boggs, J., dissenting in part) (internal quotation marks and citation omitted). In any event, Gohl need not satisfy each factor of the *Domingo* test—or even a majority of the factors—to defeat a summary judgment motion. At the very least, there is a question of fact as to whether Turbiak had a pedagogical motivation for what she did to J.G, and also as to whether the force used on J.G. was excessive, and that should be enough to get her to a jury. The district court should not have granted summary judgment with respect to Gohl's substantive due process claim, and the majority is wrong to conclude otherwise.

## C. *Gohl's Equal Protection Clause Claim*

As already discussed, the district court erred when it ignored all the evidence suggesting that J.G. was subjected to discrimination because of his disability. The district court compounded its error by incorrectly dismissing Gohl's Fourteenth Amendment Equal Protection Clause claim for the same reason, *i.e.*, by summarily concluding that Gohl cannot show any evidence of discrimination, an essential part of her claim. The majority now makes the same mistake.

Gohl alleges that J.G. was deprived of an equal education opportunity as a result of disability-based harassment of which Defendants were aware, in violation of the Equal Protection Clause of the Fourteenth Amendment. The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause prevents states from making distinctions that "(1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)).

Gohl argued in the district court, as she does here, that J.G. was harassed because of his disability. The district court granted summary judgment on the ground that Gohl did not raise a genuine issue of material fact that J.G. was treated differently than similarly situated students. The problem is that the district court's ruling on Gohl's ADA and Rehabilitation Act claims, based on the district court's contention that Gohl failed to show that the school district treated similarly situated, non-disabled students better than it treated J.G, essentially foreclosed Gohl's equal protection claim.

The district court's analysis went no further. Because it found that Gohl did not provide any evidence as to how similarly situated, non-disabled students were treated, the court ended the analysis there. *See also* Maj. Opn. at 14 ("Gohl's equal protection claims thus fail for the same reasons that her Americans with Disabilities Act and Rehabilitation Act claims do."). This analysis, and the majority's affirmation of it, completely misses the mark.

Gohl points to a number of incidents in which disabled students were subjected to various forms of abuse—being force-fed, screamed at, pushed, humiliated, and the list goes on. Gohl claims that these things happened to students with disabilities, but not to the other students at Webster Elementary School. If true, this fact alone is all the evidence she needs to create an inference of disparate treatment. Certainly, it is undisputed by the record that disabled students at the school, including J.G., were being treated less favorably than nondisabled students; the disparate treatment to which the disabled students were subjected constituted significant and damaging physical and emotional abuse. And since the district court erred in finding as a matter

of law that Gohl could not get past the similarly situated analysis, this case needs to be remanded for further consideration of Gohl's Equal Protection Clause claim.

### D.  Gohl's Municipal Liability Claim

Gohl also asserted a municipal liability claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  The district court did not reach this issue because it found that no constitutional violations had occurred.  *See also* Maj. Opn. at 14 ("No one is liable for a constitutional violation that never occurred.").  Though it is true that there can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act, *see Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007), this is not that case.  Gohl has presented enough evidence to create a genuine issue of material fact on each of her claims.  Because the district court erroneously failed to reach the merits of Gohl's *Monell* claim, a remand is necessary for the court in the first instance to make the necessary findings.

IV.

By fundamentally misapplying well-settled summary judgment standards, ignoring some of the most important facts, and disregarding evidence favorable to Gohl, the majority reveals how result-oriented it is in attempting to reach its own conclusions.  The majority's approach to this case sidesteps the Supreme Court's clear direction that when reviewing a summary judgment decision, an appellate court must examine the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor.  This basic and fundamental principle of civil procedure seems lost on the majority in this case.

All that matters here is that Gohl has presented enough evidence to create a genuine issue of material fact on each of her claims, and as a result, her case should go to a jury.  For these reasons, this case should be reversed and remanded.  I respectfully dissent.